**Lynn Rankin FRAZIER, Appellee,**

v.

**STATE CENTRAL SAVINGS BANK, Appellant,**

**Robert Barrick et al., Appellees,**

**Neil E. McManus et al., Third-Party Defendants-Appellees.**

No. 55982.

Supreme Court of Iowa.

April 24, 1974.

---

Walker, Concannon & Anderson and M. Carl McMurray, Keokuk, for appellant.

Frazier & Hoffman, Keokuk, for plaintiff-appellee.

Fehseke & Fehseke, Fort Madison, for third-party defendants-appellees.

Heard by MOORE, C. J., and RAWLINGS, REES, UHLENHOPP and McCORMICK, JJ.

REES, Justice.

This is a contest involving a will of Hazel McManus, who died purportedly testate on April 15, 1971, a resident of Keokuk in Lee County. The will which is the subject matter of this contest was executed on February 10, 1971, by which the testator devised the major portion of her estate to one Robert Barrick, a nonrelative.

Subsequent to the admission of the will to probate, the plaintiff Lynn Rankin Frazier, a great-niece and sole heir at law of the testator, brought the original action here to set aside the probate of the will as to paragraphs sixth and eighth, which items of the will were the provisions devising the property to Robert Barrick. The plaintiff in said action alleged the testator was mentally incompetent to make a will and the alleged will insofar as paragraphs sixth and eighth were concerned was not a free act of the testator but that those portions of the will were procured by the undue influence of Robert Barrick.

■ Sometime later the third-party defendants, E. J. McManus, Neil E. McManus, Jean McManus Huiskamp and Richard McManus filed their third-party petition in which they asserted they are devisees in a will of the decedent dated March 24, 1969, and that said instrument would stand as and for the last will and testament of Hazel McManus in the event the will dated February 10, 1971 and theretofore admitted to probate was set aside. They alleged the testator was mentally incompetent to make a valid will on February 10, 1971, and that said alleged will was not the free act of the decedent but was procured by undue influence. The standing of the third-party petitioners to contest the will is established by our holdings in In re Estate of Kenny, 233 Iowa 600, 602-603, 10 N.W.2d 73, 75, and cases there cited.

In the will under attack here, the testator provided for a bequest of certain bonds to an acquaintance, Nellie Griffith, with an inventory value of $59.65; for a bequest to an acquaintance, Minnie Crimmins, of $1000; of a devise of real estate to Katherine Hemmy with an inventory value of $3900; of a bequest of jewelry to plaintiff, Lynn Rankin Frazier, with an inventory value of $1150, and of real estate to Mrs. Frazier of the value of $10,000.

She then bequeathed to plaintiff, Mrs. Frazier, and to Robert Barrick certain household goods, but the inventory as filed did not identify what portion of the household goods were to proceed to Mrs. Frazier and what portion to Barrick.

In paragraph sixth of her will, the testator devised to Robert Barrick certain real

estate, having an inventory value of $30,000, and by item eighth of her will the testator provided for the establishment of a trust for the residuary estate and stipulated that one Walter Matthes was to continue to manage the property and that a Mr. & Mrs. C. F. Desnay were given the right to occupy certain of the property at the same rental they were paying at the time of testator's death. Item eighth further provided that the trust should terminate upon Mr. Matthes' death or upon his ceasing to manage the property, or upon the death of Mr. & Mrs. Desnay, whichever event occurred later, and that all of the trust property should then be paid over to Robert Barrick. The inventory value of the real estate which was impressed with the trust is shown to be $35,000.

The testator was age 78 years at her death, and lived alone on an acreage north of Keokuk; she was preceded in death by her husband, Craig McManus, who died in 1944, by a daughter-in-law Mary, who died in 1967, and by her son and only child, Glen McManus, who died in 1968. There were two dwelling houses on the acreage, one occupied by the testator, and the other occupied by Glen and Mary McManus until their deaths. Robert Barrick, a jeweler and watchmaker by trade, resided in Keokuk and became acquainted with Glen and Mary McManus in about 1963. Barrick was married and had two daughters. Being a horse fancier, he arranged to keep horses on the McManus acreage, such arrangement having been made initially with Glen McManus. The arrangement contemplated he was to pay $2 per month per head for pasturing his horses on the acreage, and it is evident that for a time he made payments under such arrangement. He continued to keep horses on the acreage following the deaths of Glen and Mary McManus. After the son's death in 1968, Barrick and his family occupied the second house on the McManus acreage during the summer months, and frequently visited with the testator even until her death.

The will under which the third-party petitioners find entitlement to contest was dated March 24, 1969 and was prepared for Mrs. McManus by Attorney William R. Sheridan of Keokuk, who remained in the practice at the the time of the preparation of the will which is the subject of this contest. By said will Mrs. McManus bequeathed the same property substantially to Nellie Griffith as was bequeathed in the last will, provided for bequests of $1,000 each to Esther Sieren and Minnie Crimmins and bequeathed to Katherine Hemmy the same property which was bequeathed to her in the last will. All of the residue of her estate she bequeathed to the third-party petitioners and the plaintiff, Lynn Rankin Frazier in equal shares.

An earlier will appears in the record here, one drawn on August 13, 1949, and which was prepared in the office of Neil E. McManus, one of the residuary legatees in the will of March 24, 1969, and who was at all times pertinent engaged in the practice of law in Keokuk. Said earlier will provided in the main for Glen McManus, the decedent's son who was then living, and for his wife if she survived him, but in the event Glen McManus predeceased his mother and was not survived by a spouse or lawful issue, the will then provided that the major portion of the estate, save and except for small specific bequests, was to proceed to Mrs. McManus' brother, Charles E. Langley, the ancestor of plaintiff Lynn Rankin Frazier, and to the lawful heirs of Mrs. McManus' husband, John Craig McManus, such class including and embracing the third-party petitioners in this action.

The record discloses that for many years prior to her death, Mrs. McManus had secured the services of the Neil McManus law office in the preparation of her income tax returns. However, in early January, 1971 her information and records for the preparation of her income tax returns for the year 1970 were taken by Barrick to the office of a Keokuk attorney, George Norman. Barrick had previously contacted

Mr. Norman and inquired as to whether he would prepare Mrs. McManus' returns. After the returns were prepared from Mrs. McManus' records, Norman was again contacted by Barrick to determine whether he would prepare a will for Mrs. McManus. On January 22, 1971, accompanied by Barrick, Mr. Norman went to the home of Mrs. McManus, where she signed the tax returns. Attorney Norman was not acquainted with Mrs. McManus prior to that date. After the tax returns had been signed, Mrs. McManus and Norman engaged in a discussion as to the proposed testamentary disposition of her property. They were seated in the front room of the McManus home and Barrick was in the same room. Attorney Norman testified that while he was discussing the provisions of Mrs. McManus' proposed will, Barrick was at the opposite end of the room watching television, but that he was in a position to overhear the discussion between Norman and Mrs. McManus if he desired to do so. After securing the data for the preparation of the will, Barrick and Attorney Norman left the McManus home together.

A rough draft of the proposed will was sent to Mrs. McManus by Attorney Norman, and on a Sunday in late January Mrs. McManus called Norman and asked if he would come out to her home to discuss the will. On this occasion no one else was at the home during the conference between Norman and Mrs. McManus. The will was later put in final form for execution, and on February 10, 1971 Mr. Norman and his associate or partner, Mr. Youngren, went to the McManus home and the will was executed by Mrs. McManus in their presence and they acted as subscribing witnesses to the same.

The record indicates that Mrs. McManus had inquired about the competency and integrity of Mr. Norman from certain friends, and was advised by them that Mr. Norman was a competent and "fair" attorney.

The record clearly establishes that Mrs. McManus was in failing health; her normal body weight had been about 130 pounds, but at the times pertinent to the questions before us weighed only about 97 to 100 pounds. Several witnesses testified that while Mrs. McManus continued to live alone, to drive her automobile and to take care of her own household, she had lost her ability to recognize friends, that she had difficulty in dressing herself, and on occasions would don her clothing backwards. She continued to have social contacts with friends, and to play cards, but she had lost her ability to hold her cards and would from time to time drop them, so that one of the friends purchased for her what was characterized as a "gadget" to enable her to hold the cards when she was playing canasta.

Dr. John R. Rankin had been engaged in the practice of medicine and surgery in Keokuk since 1933. In 1934 he married testator's niece, and is the father of the plaintiff in this action. He testified that Hazel McManus had been a patient of his since March of 1959. He had attended her during several periods of hospitalization, commencing with an admission to the hospital in February of 1962. Prior to that admission, Mrs. McManus was found on the floor of her home, and was diagnosed as being afflicted with arteriosclerosis with a cerebral blood vessel spasm or occlusion. Dr. Rankin later attended Mrs. McManus when she was admitted to the hospital in January of 1964, at which time she was diagnosed as having hypertensive cardio-vascular disease and osteoarthritis. She remained in the hospital at that time for one week but was readmitted one week later, after she had had a fainting spell at her home. On that occasion she was diagnosed as having little stroke syndrome, meaning sudden loss of consciousness or a temporary loss of consciousness. Mrs. McManus' next admission to the hospital was on January 8, 1965. Just prior to her admission at that time she was sitting at the

table in her home and suddenly passed out and lost consciousness of subsequent events. She was again diagnosed as having a little stroke syndrome, cerebral vessel spasm and cerebral arteriosclerosis.

Mrs. McManus next was hospitalized on February 8, 1970 and was discharged on February 22. Her condition at that time was diagnosed as early heart failure. On September 28, 1970 she was hospitalized due to a loss of control of her left upper extremity, that is to say, the left arm, forearm and hand. Dr. Rankin testified the arm and hand were not paralyzed but she could not control their movement nor direct them in any certain position.

On April 15, 1970 she was hospitalized and remained there for one month. On that occasion she had fallen while in downtown Keokuk but was able to drive her car to the hospital where it was determined that she had sustained a fracture of the bone in her right wrist and a severe sprain of her left knee. This incident was attributed to what Dr. Rankin characterized as a "drop-attack" which occurs commonly in patients who have advanced or narrowing arteriosclerosis.

Dr. Rankin stated that on all of the occasions Mrs. McManus was hospitalized she had an extremely high blood pressure, and that from his background and experience and from his observations of Mrs. McManus and his knowledge of her medical background and the knowledge of the fact she had sustained brain blood vessel damage she was not acutely alert and was subject to persuasion or influence. In lay terms, Dr. Rankin expressed the professional opinion, in answer to a question put to him on cross examination, that Mrs. McManus was suffering from a condition which could be characterized as softening of the brain, and that in his professional judgment the combination of the little stroke syndromes and the cerebral arteriosclerosis with which she was afflicted had definitely affected Mrs. McManus' mental operations.

Mrs. Betty Lantz testified she had been employed as a secretary in the Neil McManus law office for about ten years at the time of trial, and that commencing with the year 1962 or 1963 she had prepared Mrs. McManus' tax returns to and including the returns for the year 1969, filed in 1970. That Mrs. McManus was in later years confused is borne out by the testimony of Mrs. Lantz in which she stated that just prior to the time Mrs. McManus entered the hospital at the time of her last illness, she [Mrs. Lantz] had received a call from Mrs. McManus who inquired whether Mrs. Lantz was going to do her tax returns, and Mrs. Lantz answered saying she would do so if Mrs. McManus would get the records to her. Mrs. Lantz conveyed the essence of this conversation to Neil McManus, who went to the hospital to see Hazel McManus and to find out where the books were, but he was unable to talk with her, and it was not until after the death of the testator that Mrs. Lantz became aware of the fact that Mr. Norman had already prepared Mrs. McManus' tax returns in January of 1971.

The issue of lack of capacity to make a valid will was withdrawn from the consideration of the jury on motion of the defendant bank, and much of the foregoing factual background touches upon the question of mental capacity but is essential, in our judgment, to a full understanding of the issues presented on appeal. See In re Telsrow's Estate, 237 Iowa 672, 678, 22 N.W.2d 792, 797; In re Rogers Estate, 242 Iowa 627, 635, 47 N.W.2d 818, 823; In re Estate of Cory, Iowa, 169 N.W.2d 837, 843.

The jury invalidated the entire will on the ground of undue influence, finding that it was not the valid will of the decedent, Hazel L. McManus. Following the overruling of the motions of the defendant State Central Savings Bank for judgment notwithstanding the verdict and for a new trial, this appeal ensued.

The appellant bank asserts and advances the following stated issues which it contends require a reversal:

1. Trial court erred in refusing to direct a verdict in favor of the proponent-executor of the will, State Central Savings Bank, at the end of contestants' evidence and at the end of all the evidence on the question of undue influence.

2. Trial court abused its discretion in refusing to grant a new trial, and the verdict is contrary to the evidence for the third-party contestants failed to sustain their burden of proof that the entire will was the result of undue influence.

3. Trial court erred in prohibiting two of proponent's witnesses from testifying.

I. The proponent bank contends the evidence is insufficient to support the jury's finding of undue influence, and that proponent's motion for directed verdict and for judgment notwithstanding the verdict and for new trial should have been sustained.

■ Undue influence in cases of this kind may be and usually is proven by circumstantial evidence. Direct proof is seldom available. See In re Telsrow's Estate, *supra*, 237 Iowa at 677, 22 N.W.2d at 796, and cases there cited.

■ It is impossible to separate the issue of undue influence in a will contest from that of testamentary capacity. Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind. One who is infirm is more susceptible to influence than one who is not. See In re Telsrow, *supra*; In re Estate of Ensminger, 230 Iowa 80, 82, 296 N.W. 814, 815, and cases cited.

■ While opportunity and disposition to exercise undue influence are properly to be considered, proof of such opportunity and disposition is insufficient. Also, importunity, request and persuasion that do not control the will are not enough. That a will is unnatural, unjust, or unreasonable is also a proper circumstance to be considered along with evidence that undue influence was exerted as tending to confirm the claim of undue influence. In re Telsrow, *supra*, and cases cited.

■ As we stated in *Telsrow, supra*, at page 678 of 237 Iowa, page 796 of 22 N.W.2d, this may be a borderline case on the issue of undue influence, but we are disposed to find the evidence sufficient to support the jury's finding of undue influence on the part of Robert Barrick. Too many significant circumstances militated against the sustaining of a directed verdict in favor of the proponent.

Robert Barrick first became acquainted with Hazel McManus through the testator's son and daughter-in-law. After the death of both Glen and Mary McManus (the son and daughter-in-law), Robert Barrick had frequent contacts with the testator; in fact, the record would justify a conclusion that he saw her daily. The record shows that at one time Barrick suggested to Mrs. McManus that she refer to him as "son", and that on other occasions he suggested to her that she refer to him as "Robert", but that she indicated to him, and to friends in telling them about the incidents, that she did not know him well enough to call him "Robert" and always made reference to him as "Barrick".

Prior to the death of Glen McManus, Barrick paid rental for keeping his horses on the McManus acreage, but after Glen's death he quit paying rent. After a short period of time he moved into the son's house during the summer months and paid no rent, and permitted Mrs. McManus to pay his utility bills. There is testimony in the record that Barrick on occasions when he was out of town, wrote almost daily to Mrs. McManus. When the testator needed hospitalization and her friends could not persuade her to enter the hospital, Barrick was able to persuade her to do so.

Irrespective of the fact that Neil McManus, a nephew by marriage and a lawyer, had customarily prepared Mrs. McManus' income tax returns for her, in January of 1971 just three months prior to the testator's death, and while she was in a weakened physical and mental condition, Barrick took testator's income tax books and records to his own attorney for preparation and procured his attorney to accompany him to the home of the testator to procure information prefatory to the preparation of the will which is under attack here. Barrick remained in the same room with the testator and Barrick's attorney while the substance of the proposed will was being discussed.

The will as executed by Mrs. McManus departs substantially from her prior wills which were introduced on the trial, in that it leaves the greater portion of her entire estate to Barrick to the exclusion of relatives.

■ No one of the instances recited above would, in our judgment, constitute evidence of a disposition on the part of Robert Barrick to unduly influence Hazel McManus in the preparation of a will. Collectively, however, the facts support a showing or inference of an opportunity and a disposition on the part of Robert Barrick to unduly influence the last will and testament of the testator. The rules of law applicable to the issue of undue influence in the execution of wills are set out in In re Estate of Roberts, 258 Iowa 880, 888, 889, 140 N.W.2d 725, 730, and were referred to in In re Estate of Cory, *supra*, at 842 of 169 N.W.2d. In In re Estate of Roberts, *supra*, this court said:

"The elements which must be present to justify submission of a case to a jury because of undue influence are: (1) the person be unquestionably subject to undue influence, (2) opportunity to exercise such influence and effect the wrongful purpose, (3) a disposition to influence unduly for the purpose of procuring an improper favor, and (4) the

result clearly appearing to be the effect of undue influence. (Citations)."

In Johnstone v. Johnstone (Iowa 1971), 190 N.W.2d 421, at 425, we said:

"We have repeatedly stated the rules of law applicable to the issue of undue influence in the execution of a will. (citations).

"We need not repeat them here as we are concerned only with one of the elements which must be present to justify submission of the issue of undue influence to the jury. The trial court directed a verdict on the ground that the evidence failed to generate a jury question as to whether Mr. Johnstone was 'unquestionably subject to undue influence'.

"The use of 'unquestionably subject to undue influence' first appears in In re Ankeny's Estate (1947), 238 Iowa 754, 28 N.W.2d 414, which cites a comment in 30 Iowa Law Review, 321 quoting from In re Leisch's Will (1936), 221 Wis. 641, 267 N.W. 268, in which that phrase is used in enumerating four elements necessary to prove undue influence. It does not appear that the phrase has been repeated in the Wisconsin cases. They now use the term 'susceptible of being unduly influenced'. (citations)

"A majority of the court believes this quoted phrase, which has appeared as recently as In re Estate of Cory, supra, if literally applied, would make it almost impossible to prove undue influence and that it is too strong a statement for the showing this court has actually required in order to make a case for the jury. (citations). We believe it is more accurate to state that the contestant must show that the testator was 'susceptible to *undue* influence'. (citations)."

We believe the record justified the conclusion that Hazel McManus was "susceptible to undue influence" at, prior to, and subsequent to the time she executed the will here questioned.

One significant incident, in our judgment, militates very strongly against the principal beneficiary in Mrs. McManus' will. On December 17, 1971 the deposition of Robert Barrick was taken. In answer to questions put to him at the time of the taking of the deposition, he stated he did not know the purpose for Attorney George Norman going with him to Mrs. McManus' home in January of 1971. On March 7, 1972 an affidavit of Robert Barrick was filed in this case and we set out the substance thereof verbatim:

"I, ROBERT BARRICK, being first duly sworn upon my oath do depose and state that since the taking of my deposition on the 17th day of December, 1971, I have had an opportunity to read it over and I note that at Pages 40, 44 and 45 and again at Pages 62 and 63, I have indicated that I did not know the purpose for George Norman going to Mrs. McManus' home in January of 1971. Upon reflection, I now believe I was mistaken about this statement and I now recall that I may have been told by Mrs. McManus that she wanted her will changed and I told Mr. Norman this. George Norman then asked me to go out to her place and introduce him to her."

It is inconceivable to us that Robert Barrick would not have remembered at the time of the taking of his deposition that he procured Attorney Norman to go to Mrs. McManus' home, or to recall that he had told Mr. Norman in advance that Mrs. McManus wanted her will redrawn, particularly in view of the fact that he was physically present in the same room with Mr. Norman and Mrs. McManus when the information was furnished for the preparation of the will. Such lack of candor on the part of Robert Barrick evidences to us suspect or improper motives on his part in the entire transaction, and demonstrates a disposition to influence the making of the testator's will.

We find no merit, therefore, in the contention of defendant bank that trial court erred in refusing to direct a verdict in its favor as proponent-executor of the will on the question of undue influence or that the court's refusal to grant a new trial was an abuse of discretion.

II. The defendant State Central Savings Bank contends the trial court erred in prohibiting two of proponent's witnesses, namely, Janette Barrick, the wife, and Clarcie Barrick, the daughter of Robert Barrick, from testifying.

There is no question that the rule on witnesses was invoked in this case, and further that Janette Barrick and Clarcie Barrick were in the courtroom from time to time during the trial prior to their being called as witnesses for the proponent. The transcript of testimony which was certified to us discloses that on the morning of May 13, 1972, after the jury had been impaneled and sworn, Mr. Hoffman, one of counsel for plaintiff, stated, "Your Honor, we would like to have the rule on witnesses." Thereupon, the court said, "If there are any persons in the courtroom who will be called as witnesses in this matter, we will ask that they retire to a witness room. I might state, gentlemen, I have no way of knowing who your witnesses are, so I'll hold you each responsible to see that your witnesses are out of the courtroom during the time of trial." When Janette Barrick and Clarcie Barrick were called, opposing counsel called attention to the court's rule of exclusion and objected to their being permitted to testify. The objections to the witnesses being permitted to testify were sustained and proponent's counsel then dictated into the record an offer of proof which was, as indicated in the certified transcript, properly objected to by counsel for the third-party defendants. There is no statute or rule of procedure in Iowa with reference to the exclusion of witnesses. However, the rule for sequestering witnesses has been enforced by judicial decision. In In re Smith's Will, 245 Iowa 38, 45, 60 N.W.2d 866, 870, we said:

"We prefer to follow the majority rule * * * which holds the trial court has

a reasonable discretion in disqualifying a witness who has violated an exclusionary order. It must be expected this discretion will be exercised in a spirit of fairness and so that it will not unjustly deprive a litigant of helpful testimony.

The trial court is on the scene; it knows the situation far better than we can possibly do, and within reasonable limits, it must be permitted to enforce its own rules, by disqualification of the witness in a proper case. Any other holding would make a rule of exclusion valueless."

See State v. Musack, 254 Iowa 104, 111, 116 N.W.2d 523, 527; Wigmore on Evidence, Vol. 6, § 1842; 53 Am.Jur., Trial, § 33, pp. 48–49; Anno., 14 A.L.R. 3d 16, 22, 30.

We conclude the ruling of the trial court excluding the testimony of Janette Barrick and Clarcie Barrick was within the proper exercise of the court's discretion.

We find no error necessitating reversal, and affirm the trial court.

Affirmed.