In the Matter of the ESTATE OF Patricia A. DANKBAR, Deceased.

FIRST SECURITY BANK & TRUST CO., as Administrator of the Estate of Frank Dankbar, Appellee,

v.

Roger CHRISTIANSON, Individually, and as Executor of the Estate of Patricia A. Dankbar, and Floyd Ensign, Appellants.

Hanford Macnider Museum, Defendant.

No. 87-267

Supreme Court of Iowa.

Oct. 19, 1988.

■■■■■■■■■■■■■■■■

David M. Nelsen and John S. Mackey, Mason City, for appellant Christianson.

Herman P. Folkers, Mason City, and Robert M. Austin, Austin & Roth, Minneapolis, Minn., for appellant Floyd Ensign.

Keith A. McKinley of Dunkelberg, McKinley & Folkers, Osage, and Thorkel E. Sondrol III, Clear Lake, for appellee.

Considered by HARRIS, P.J., and SCHULTZ, NEUMAN, SNELL, and ANDREASEN, JJ.

NEUMAN, Justice.

This appeal involves a challenge to the validity of the last will and testament of Patricia A. Dankbar. After a four-week trial, a jury returned special verdicts finding Patricia lacked the testamentary capacity to execute a will, and that her will was obtained through the undue influence of her conservator, appellant Roger Christianson, and her attorney, appellant Floyd Ensign. In conformity with these verdicts, the district court entered an order invalidating Patricia's will and revoking the executor's letters of appointment.

As the primary beneficiaries under the challenged will, appellants Christianson and Ensign raised a host of evidentiary objections at trial and contend on appeal that the evidence was insufficient to generate a jury question on Patricia's testamentary capacity or their alleged undue influence. Finding no merit in any of the assigned errors properly preserved for appeal, we affirm the district court.

## I. *Scope of Review.*

An action to set aside a will is triable at law and, accordingly, our review is for errors only and not de novo. Iowa Code §§ 633.33, 633.311 (1987); *In re Estate of Herm,* 284 N.W.2d 191, 200 (Iowa 1979). Findings of fact in a law action are binding upon this court on appeal if supported by substantial evidence. Iowa R.App.P. 14(f)(1).

## II. *Background Facts and Proceedings.*

At the outset, we direct counsel to Iowa Rule of Appellate Procedure 15(d). That rule, ignored *in toto* here, requires that the appendix be indexed for ease of reference and that portions of the transcript omitted, as well as included, be noted by page and witness name. Counsels' failure to compile a table of contents, or in any way index or arrange the appendix in an understandable manner, has immeasurably burdened this court's review of pleadings, motions, four weeks of testimony, and accompanying exhibits.

Despite the disarray of the appellate record, the following facts emerge with clarity. Patricia A. Dankbar was born in December 1927, the only child of Frank and Elma Dankbar. As a child, she was reportedly happy and intelligent. Her teen years, however, were marked by an unexplained emotional upset which left her depressed, withdrawn, and socially isolated.

Nevertheless, Patricia completed one year of college followed by full-time employment in a ladies' clothing store. She then held a long-term position with the city assessor's office. During this time she was involved in one serious romantic relationship, but never married.

Beginning in 1951, Patricia's health began deteriorating to the point where she was discharged from her employment by the city assessor and was never again self-supporting by gainful employment. In 1955 she was hospitalized with complaints of severe weakness, later diagnosed as a mental illness called neurasthenia, or nervous weakness. Medical records disclose that she was administered Thorazine, a powerful anti-psychotic drug just newly marketed in this country at that time and reserved for people thought to be very ill.

In 1957, Patricia sought treatment at the Mayo Clinic. Then age 30, her mental illness was described as a schizoid personality, with a very poor prognosis for recovery. She consulted a wide variety of health practitioners, including a chiropractic clinic in Denver, Colorado, all to no avail.

Psychiatric records from the Mayo Clinic dated April 1960 confirmed a diagnosis of schizophrenia, and recommended Patricia's long-term institutional care. Although her condition improved somewhat during the late 1960's and early 1970's, by the end of 1974 Patricia was bedridden continuously and under the constant care of her mother. Her mother died in April 1976. Two weeks later, Patricia was admitted to a hospital in deplorable condition—malnourished, dehydrated, unkempt, and unwashed. Although she was oriented to place and time, attending physicians described Patricia's insight and judgment as poor and records reveal a diagnosis of "PSEUDONEUROTIC OR LATENT SCHIZOPHRENIA, CHRONIC." She was transferred to a nursing home for extended care.

Upon her mother's death, Patricia inherited a two-thirds interest in her family's 200 acre farm. A short term acquaintance, Archie Bilyieu, was appointed Patricia's conservator. He is described in the record as a self-styled "nerve masseur."

Within a month after her discharge from the hospital and admission to the nursing home, Patricia signed a will drawn by her attorney, Floyd Ensign, that left all of her property to Archie Bilyieu. On that same day, Bilyieu and Ensign executed an agreement which provided that Ensign was to receive a 20% share of Patricia's property when she died. The agreement went on to provide that if Ensign died before Patricia, 5% of her property would pass to Ensign's son and law partner, Craig Ensign, and the remaining 15% would go to Floyd Ensign's estate.

Two months later, attorney Craig Ensign drafted and recorded a deed, signed by Patricia, conveying all of her farmland to Bilyieu. When Bilyieu died in 1979, Craig's father, appellant Floyd Ensign, petitioned to set aside the deed, claiming Patricia was "mentally unable to attend to her own business affairs and wholly unaware of the import of the deed which she signed." Ensign obtained a consent decree which transferred the farm back to Patricia. Six days later, a friend and former legal associate of

Floyd Ensign drew a new will for Patricia which left all her property to Floyd Ensign.

Following the death of Archie Bilyieu, banker Roger Christianson was appointed Patricia's conservator. In August 1980, Patricia became critically ill and forced to seek medical treatment for what was diagnosed as advanced breast cancer. On September 29, 1980, with the aid of Roger Christianson, Patricia drew a new will leaving $10,000 to a local museum, and the remainder distributed one-fourth to Floyd Ensign and three-fourths to Roger Christianson. Christianson chose the attorney to draft the instrument, giving him notes of Patricia's purported directions. The original and a copy of the will were left with Christianson for safe keeping. Nevertheless, when Patricia died in 1983, Christianson expressed surprise that he had been left the bulk of her estate, valued in excess of $400,000.

Patricia's father and sole heir, Frank Dankbar, petitioned to set aside this 1980 will. Upon Frank's death, the administrator of his estate was substituted as plaintiff. Further facts will be detailed as they become pertinent to the specific errors urged on appeal.

### III. *Plaintiff's Cause of Action.*

Before proceeding to appellants' challenges, a brief review of the nature of Frank Dankbar's action is in order. Plaintiff's petition, as amended, alleged that when the September 1980 will was executed, Patricia lacked testamentary capacity and was without sufficient physical and mental strength to resist the influence of Roger Christianson and Floyd Ensign, who then stood in fiduciary relationships with her. Thus, the petition alleged, the purported will was not Patricia's, but rather the will of these two men having influence over her.

Our cases have established a four-part test by which a fact finder must measure testamentary capacity. The testator must: (1) understand the nature of the instrument being executed; (2) know and understand the nature and extent of his or her property; (3) remember the natural objects of his

or her bounty; and (4) know the disposition he or she desires to make. *In re Will of Grahlman,* 248 Iowa 535, 539, 81 N.W.2d 673, 676 (1957).

The elements necessary to sustain a finding of undue influence in the execution of a will are: (1) the testator's susceptibility to undue influence; (2) opportunity to exercise such influence and effect the wrongful purpose; (3) disposition to influence unduly for the purpose of procuring an improper favor; and (4) a result clearly the effect of undue influence. *In re Estate of Davenport,* 346 N.W.2d 530, 532 (Iowa 1984).

Because direct proof is rarely available in such contests, undue influence may be proven by circumstantial evidence. *Estate of Herm,* 284 N.W.2d at 201; *Olsen v. Corporation of New Melleray,* 245 Iowa 407, 413, 60 N.W.2d 832, 836 (1953). Unnatural, unjust, or unreasonable distributions may be properly considered. *Estate of Herm,* 284 N.W.2d at 201. As this court observed in *Olsen,* " '[c]onduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate on a failing mind.' " 245 Iowa at 416, 60 N.W.2d at 838 (quoting *Brogan v. Lynch,* 204 Iowa 260, 264, 214 N.W. 514, 516 (1927)). While the burden of proof remains with the contestant, the law is well settled that, in considering the sufficiency of the evidence to support the finding of the jury, the evidence must be viewed in the light most favorable to the contestant, who is given the benefit of all permissible inferences. *Id.* 245 Iowa at 413, 60 N.W.2d at 836.

Where, as here, the persons charged with undue influence stand in a fiduciary relationship with the testator, unique opportunities for influence exist which may be properly considered. Thus, when the dominant party in such relation " 'initiates the preparation of the will or gives directions as to its contents to the scrivener ... and is made a beneficiary thereunder,' " there arises a suspicion, but not a presumption, of undue influence. *See Olsen,* 245 Iowa at 413–14, 60 N.W.2d at 837 (quoting *Graham v. Courtright,* 180 Iowa 394, 407, 161

N.W. 774, 778 (1917); *see also Estate of Herm,* 284 N.W.2d at 201.

IV. *Arguments on Appeal.*

A. Admissibility of expert testimony.

■ Over Floyd Ensign's objection, plaintiff was permitted to offer the testimony of attorney William Engelbrecht on the issue of Ensign's disposition to unduly influence Patricia Dankbar. Engelbrecht, a past president of the Iowa State Bar Association and five-year chairman of its grievance committee, testified with regard to the standards set by the Iowa Code of Professional Responsibility for Lawyers, and how Ensign's actions in 1976 violated certain of those standards. Specifically, Engelbrecht opined that Ensign's side agreement with Archie Bilyieu to share in the proceeds of Patricia's estate violated EC 5–2 (lawyer should refrain from acquiring property right or assuming position that would make his judgment less protective of client's interests); EC 5–3 (self-interest of lawyer resulting from ownership in client's property may interfere with judgment on behalf of client and must be disclosed); EC 5–6 (lawyer should not consciously influence client to name him as executor, trustee, or lawyer in an instrument); DR 5–107(A)(1) and (2) (except with consent of client after full disclosure, lawyer shall not accept compensation for legal services from one other than client or accept from one other than client any thing of value related to lawyer's representation or employment by client).

On appeal, Ensign contends that to permit Engelbrecht to so testify was the equivalent of allowing an expert to testify on a matter of law, thereby erroneously supplanting the role of the trial judge in instructing the jury. Secondly, Ensign claims that the testimony, even if relevant and admissible, was more prejudicial than probative and should not have been allowed. We cannot agree.

As a general rule, the Iowa Code of Professional Responsibility "sets the standard for an attorney's conduct in any transaction in which his professional judgment may be exercised." *Cornell v. Wunschel,*

408 N.W.2d 369, 377 (Iowa 1987); *see Menzel v. Morse*, 362 N.W.2d 465, 471 n. 4 (Iowa 1985). In a malpractice case, for example, a plaintiff must "produce evidence to show the standards of conduct and practices, or bench marks, that establish the requisite skill and knowledge of members in good standing in the defendant's trade or profession." *Menzel*, 362 N.W.2d at 471 (citation omitted). Where breach of an established standard of conduct is not so clear that it lies "within the ken of laymen," expert testimony is allowable to prove the violation. *See Freese v. Lemmon*, 267 N.W.2d 680, 687–88 (Iowa 1978).

We think *Cornell* is instructive in this regard. There we held that the trial court properly instructed the jury with regard to an ethical canon that set out a clear standard of disclosure. Expert testimony was not necessary to interpret or clarify the standard of conduct, and a simple instruction to the jury on the code section was sufficient. ·*See Cornell*, 408 N.W.2d at 378. Implicit in *Cornell* is the corollary proposition that expert testimony may be admissible where necessary to clearly explain a breach of those standards.

After reviewing the ethical considerations and disciplinary rules implicated here, we are not convinced that a jury instruction would, without the help of expert testimony, sufficiently explain the standards of conduct so that a lay person could determine whether Ensign's conduct exceeded the bounds of accepted practice. Nor, as appellant suggests, did the admission of Engelbrecht's testimony allow him, as an expert, to testify to an ultimate issue of law. The issue here is one of undue influence in a will contest, not an action against Ensign for violating the code of professional responsibility. *See Cornell*, 408 N.W.2d at 376, 377 (while defendant's violation of code of professional responsibility was not "proper matter for review" in fraud suit, code nonetheless supplied "yardstick" by which to measure propriety of conduct).

■ Moreover, we are persuaded that evidence of Ensign's breach of his ethical obligation to Patricia in connection with these testamentary matters is probative, and not unfairly prejudicial, on the question of his propensity towards unduly influencing her on closely-related matters. The district court was within its discretion to submit such testimony. The assignment of error is without merit.

**B. Sufficiency of evidence on issue of testamentary capacity.**

At the close of plaintiff's case, appellants moved for a directed verdict, claiming the evidence was insufficient to generate a jury question on Patricia's testamentary capacity. We therefore turn to a review of the evidence, bearing in mind our duty to review the record in the light most favorable to the contestant. *Olsen*, 245 Iowa at 413, 60 N.W.2d at 836.

Plaintiff's evidence of Patricia's testamentary incapacity centered on the testimony of a forensic psychiatrist, Dr. Vernon Varner. Employing a methodology routinely used in the diagnosis of his patients, Dr. Varner compiled and reviewed extensive data concerning Patricia's family and medical history dating from adolescence to the time just preceding her death. His sources of information included family members, neighbors, acquaintances, medical records and attending physicians.

■ Preliminarily, we note that both Ensign and Christianson assert on appeal that the court erred in permitting Dr. Varner to testify, inasmuch as his testimony was based in large part on the hearsay statements and opinions of others. Appellants' objection to Dr. Varner's testimony was addressed and overruled by pretrial motion under Iowa Rule of Evidence 104(a). At trial, his testimony came in without further objection. However, reversible error cannot be predicated on an order overruling a motion in limine where, as here, the trial judge overruled the motion without directly ruling on the admissibility of the evidence. *Compare State v. Judkins*, 242 N.W.2d 266, 269 (Iowa 1976) *with State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979). Record of the objection must be made during trial when the evidence is offered. *Judkins*, 242 N.W.2d at 269.

We therefore turn to the merits of the expert testimony. The doctor offered a number of opinions crucial to plaintiff's proof of Patricia's testamentary capacity. First, he testified that on September 29, 1980, Patricia suffered from schizophrenia, paranoid sub-type, a chronic mental illness evident in her medical records since 1955. The doctor further testified from a review of Patricia's psychiatric history that, despite scattered periods of lucidity, she was never free from the effects of the illness from its onset to the time of her death.

Secondly, a significant feature of Patricia's illness was a fixed, false belief that her father was an alcoholic who emotionally abused her as a child and ultimately ruined her life. From his extensive interviews with persons acquainted with Patricia and her father for at least thirty years, Dr. Varner could find no rational basis for such belief. Patricia's delusion was described by the doctor as typical of schizophrenic paranoid sub-type; in his words, "it is a product of the brain disease." This led the doctor to conclude that on September 29, 1980, Patricia did not have the capacity to recall the natural objects of her bounty.[1]

Third, in response to a question whether Patricia knew the disposition she desired to make of her property, Dr. Varner described another characteristic of Patricia's illness, evident in her history: the inability to make decisions. This, in his opinion, would naturally lead her to be easily influenced by one who would set out to do so. In other words, her indecisive behavior was the product of "delusions and influenceability tied together."

We need not lengthen this opinion by recounting the further evidence offered by Dr. Varner and other witnesses in support of plaintiff's claim that Patricia lacked testamentary capacity when she executed her 1980 will. Dr. Varner's testimony alone generated a jury question on each of the essential elements on which such capacity must be measured. *See In re Will of*

*Grahlman,* 248 Iowa at 539, 81 N.W.2d at 676. Where, in a will contest such as this, "there is testimony, which if believed, would support a finding of an unsound mind, it is a question for the jury." *In re Estate of Guinn,* 242 Iowa 542, 545, 47 N.W.2d 243, 244 (1951). The district court properly overruled appellants' motions for directed verdict on this issue.

C. Sufficiency of the evidence on Ensign's undue influence.

Ensign contends that the trial court erred in overruling his motion for directed verdict at the close of plaintiff's case. He argues that the evidence was insufficient to show that he influenced Patricia in any way in connection with the execution of her 1980 will. While we agree that there is no evidence of direct involvement by Ensign in Patricia's last will, we find no error in the trial court's conclusion that a reasonable fact finder could infer from all the evidence presented that Ensign proceeded on a course of conduct designed to falsely enhance his standing in her eyes and thereby influence her in the disposition of her property.

We have already recounted the questionable practice employed by Ensign within a month after Patricia's 1976 hospitalization for mental illness, whereby he arranged to secure 20% of her estate without her apparent knowledge or consent. Two months later, Ensign's son and law partner inexplicably transferred all of Patricia's farmland to the conservator with whom Ensign had this side agreement. As plaintiff aptly observes, "instead of quietly and professionally setting about to right a wrong which should have been an embarrassment to himself and his law firm," Ensign elected to sue the Bilyieu heirs and posture himself in Patricia's eyes as the one who protected her fortune by saving the family farm. Apparently the charade worked, for six days after the deed was set aside, Patri-

---

**1.** Appellants assign as a separate point of error the trial court's refusal to instruct the jury with regard to "insane delusions." This concept, described in *Firestine v. Atkinson,* 206 Iowa 151, 153–58, 218 N.W. 293, 294–96 (1928) simply has no applicability where, as here, the testator's delusion is but one of the many manifestations of her total mental illness that bears on her testamentary capacity.

cia signed a will leaving all of her property to Floyd Ensign.

The record is silent as to what role, if any, Ensign played in Patricia's life in the intervening year before she executed the contested will that reduced his share to one-fourth. Nevertheless, given Patricia's mental instability throughout this period, and the suspicion generated by a bequest to one who stands in a fiduciary relationship to the testator, we think the circumstantial evidence introduced by plaintiff clearly generated a jury question on the cause and effect elements of Ensign's alleged undue influence.

D. Sufficiency of the evidence on Christianson's undue influence.

■ Roger Christianson likewise urges error in the trial court's failure to sustain his motion for a directed verdict on the issue of his undue influence. Like the trial court, however, we are convinced from a review of the record that substantial evidence was produced on each of the elements essential to plaintiff's proof, i.e., susceptibility, opportunity, disposition, and result. *See In re Estate of Davenport,* 346 N.W.2d at 532.

As previously noted, the question of Patricia's susceptibility to influence cannot be seriously contested. Not only did plaintiff offer expert opinion on this matter, five other witnesses described her as easily influenced. Included in this number was Orville Witte, the only man with whom Patricia enjoyed a serious relationship. He testified that she could be influenced by anyone showing her attention.

As for opportunity to exercise influence, Roger Christianson's role as conservator gave him first hand knowledge of Patricia's financial affairs, placing him in regular contact with her, and reposing her confidence and trust in him. After conferring with Patricia concerning the contents of her last will, he personally secured the scrivener (an attorney previously unknown to Patricia) and delivered to him an outline of the proposed instrument, expecting the will to be drawn from those notes. The evidence reveals that when the attorney insisted on a personal interview with Patri-

cia at the nursing home, Christianson arranged to be present and left Patricia's side only at counsel's request. He personally picked up the original and one copy of the will at the attorney's office that same day.

On the question of Christianson's disposition to unduly influence Patricia for the purpose of procuring an improper benefit for himself, plaintiff offered three pieces of significant circumstantial evidence. First, Christianson was knowledgeable in the behavior of the mentally ill, having been educated as a recreational therapist for the mentally handicapped prior to assuming his role as officer in his family's bank corporation. Second, Christianson served simultaneously as conservator for both Patricia and her father, Frank. Records reveal that after the 1980 will was executed, Christianson authorized the payment of virtually all of Patricia's living expenses out of Frank's conservatorship assets, thereby preserving Patricia's estate and Christianson's expected inheritance.

Third, Christianson told no one, not even Floyd Ensign, that a new will had been executed. After Patricia's death, he feigned surprise upon learning that he was her primary beneficiary, notwithstanding his full knowledge of the contents of her will. We think it reasonable for a fact finder to infer from such lack of candor an improper motive. *See Frazier v. State Central Savs. Bank,* 217 N.W.2d 238, 245 (Iowa 1974).

Finally, the substantial bequest to Christianson is at best surprising and, at worst, suspicious. Christianson was not a family member. He was no more than a casual acquaintance and local banker when he became Patricia's fiduciary and soon found himself the proposed inheritor of over $300,000. Even if we assume, as Christianson contends, that entirely legitimate inferences can be drawn from the facts we have recited, "as long as the inferences ... are in equipoise, the question of undue influence is for the jury." *In re Estate of Ankeny,* 238 Iowa 754, 761, 28 N.W.2d 414, 418 (1947). The district court was correct in so ruling.

### V. *Conclusion.*

We have carefully considered the remaining assignments of error urged by the appellants and find them to be without merit. For the reasons previously stated, error predicated on motions in limine regarding unavailable declarants and lay witnesses has not been properly preserved for appeal. On the question of the trial court's refusal to allow surrebuttal evidence proffered by defendants after four weeks of testimony, we fail to find any abuse of discretion. Accordingly, we affirm the judgment of the district court in its entirety, including taxation of costs to the defendants.

AFFIRMED.