In the Matter of the **ESTATE OF Margaret OLSON, Deceased.**

**George W. HUFFEY and Jean Huffey, Appellants,**

v.

**Joseph LEA, Dorothy Lea, Gilbert Lea, Florence Flaherty, Linda Racek, Theresa David, Anthony Lea, LaVonne Lea-Peterson, Donna Lea, Leatrice Huffey-McEvilly, Sheryl Lea, Kathy Lea,**

Christine Ladd, Adelaide Aldrich, Anthony Lea as Trustee for Ambrose M. Lea, Eunice Lea, Old East Paint Creek Church, and Waldorf College, Appellees.

No. 88–1487.

Court of Appeals of Iowa.

Nov. 27, 1989.

David J. Dutton of Mosier, Thomas, Beatty, Dutton, Braun & Staack, Waterloo, for appellants.

James U. Mellick, Waukon, for appellees Leas, Flaherty, Racek, David and Lea–Peterson.

Steven R. Bakke of Bakke, Petersen & Peterson, Forest City, for appellee Waldorf College.

W. Richard White and Lyn Morrow, Waukon, of Morrow & White, for estate of Margaret Olson.

Heard by HAYDEN, P.J., and SACKETT and HABHAB, JJ.

HAYDEN, Presiding Judge.

The appellants, George and Jean Huffey, contested the July 16, 1986, will of George's aunt, Margaret Olson, claiming undue influence and lack of testamentary capacity. The case was tried to a jury, which found both undue influence and lack of testamentary capacity and set aside the will. The defendants, including Margaret's brother, two sisters, and nieces and nephews, moved for a judgment notwithstanding the verdict and a new trial. Both motions were granted. The Huffeys now appeal. We reverse on the judgment notwithstanding the verdict and reinstate the jury verdict setting aside the July 16 will.

Margaret Lea married Hjalmar Olson in 1946. They moved into a new house built on the Olson farm and lived there until their death in 1986. This farm has been in

the family since 1849. Margaret and Hjalmar had no children.

Hjalmar's sister, Tilda Huffey, and her husband bought the farm next to the Olson farm. Their son, George Huffey, was born on this property. During the depression the Huffeys lost the farm and it was later purchased by Hjalmar.

Hjalmar and George were close. George and his sister lived with Hjalmar from the time George was eight until he was twenty-three years old. Hjalmar sold George the "Huffey farm" and the two men helped each other with crops, chores, and the raising of livestock.

When Hjalmar suffered a heart attack in 1976, he was forced to stop farming. He rented the Olson farm to George, who has continued to operate both farms.

In 1981, Hjalmar executed a will which provided for the residue of his estate, consisting primarily of the farm, to go to George Huffey if Margaret did not survive her husband for thirty days. Hjalmar died on June 16, 1986.

On June 18, 1986, Margaret met with attorney Lynn Morrow. He drew up a will which left her personal property and some specific bequests to members of her side of the family (the defendants). These bequests totaled $22,000. The bulk of her estate, including the Olson farm, was left to George Huffey.

In January 1986, Margaret was diagnosed as having pancreatic cancer. On July 9, 1986, almost one month after Hjalmar's death, she was hospitalized in La-Crosse, Wisconsin, because of recurring problems related to the cancer. She had surgery on July 17, 1986, and returned home on July 29. She died in a Waukon hospital on August 13, 1986.

While hospitalized in LaCrosse, Morrow drew up a second will. Margaret signed it on July 16th, the day before her surgery. This is the will in question. A third will was drafted after the surgery, but was neither signed nor dated.

The Huffeys contested this will, contending the two nieces who lived with Margaret during the last months of her life unduly influenced their aunt to deny George Huffey the farm. The jury returned a verdict in favor of the Huffeys, finding Margaret did not have the mental ability to make a will and the will admitted to probate was not her free act and was procured by undue influence.

At the close of the evidence and after both parties rested, defendants made a motion for a directed verdict on the alleged grounds there was not substantial evidence to show lack of testamentary capacity and undue influence. In relying upon *Larkin v. Bierman*, 213 N.W.2d 487 (Iowa 1973), the trial court reserved its ruling on this motion. After the jury returned its verdict, the trial court sustained defendants' motion for judgment notwithstanding the verdict pursuant to Iowa Rule of Civil Procedure 243(b), and concluded there was not substantial evidence to support the allegations of the petition. The trial court found, in addition, the verdict was not sustained by sufficient and substantial evidence, and it erred in not granting defendants' requested instructions. A new trial was ordered.

On appeal the Huffeys contend the trial court erred in granting the judgment notwithstanding the verdict because there was substantial evidence of undue influence and lack of testamentary capacity to support the submission of those issues to the jury. Huffeys further argue the trial court was correct in refusing to instruct the jury as requested by the defendants.

An action to set aside a will is triable at law; accordingly our review is for errors only. *Matter of Estate of Dankbar*, 430 N.W.2d 124, 126 (Iowa 1988). In reviewing the propriety of the trial court's ruling granting judgment notwithstanding the verdict, we view the evidence in accordance with the same principles required for review by a trial court on a motion for a directed verdict. *Watson v. Lewis*, 272 N.W.2d 459, 463 (Iowa 1978), citing to *Meeker v. City of Clinton*, 259 N.W.2d 822, 828 (Iowa 1978). Our task then, is to view the evidence in the light most favorable to the nonmoving party, regardless of whether such evidence is contradicted, to deter-

mine if reasonable minds could differ on the issue. *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443, 444 (Iowa App.1985). If reasonable minds could differ, the issue is for the jury. *Id.*

■■■ 1. Undue Influence. The elements necessary to sustain a finding of undue influence in the execution of a will are: (1) the testator's susceptibility to undue influence; (2) opportunity to exercise such influence and effect the wrongful purpose; (3) disposition to influence unduly for the purpose of procuring an improper favor; and (4) a result clearly the effect of undue influence. *Matter of Estate of Dankbar*, 430 N.W.2d at 128 (Iowa 1988). Because direct evidence is only rarely available in will contests, undue influence may be proven by circumstantial evidence. *Id.*

■■ A review of the record has convinced us substantial evidence was put forward on each of the elements essential to prove undue influence.

Although Margaret was at one time strong-willed, when the contested will was drawn up she was an 83–year–old woman who had lost her husband of forty years one month previously. She was in pain and hospitalized for surgery necessitated by the advance of pancreatic cancer. There is evidence to show she was confused about her financial affairs even before she entered the hospital. This is sufficient evidence of Margaret's susceptibility to influence. The supreme court has concluded "conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate on a failing mind." *Id.*

There is no question Dorothy Lea and Theresa Lea David had ample opportunity to exercise influence and effect the wrongful purpose. Theresa moved into Margaret's home in January 1986 when Margaret became ill, and remained until Hjalmar died. She became close to the couple and wrote checks for Margaret, paid bills, and communicated with others for Margaret, who required two hearing aids. The list from which Morrow drafted the July 16 will was prepared by Dorothy and Theresa. At the same time the list was being drawn up, Theresa was repeatedly calling Morrow at the office, at home in the evenings, and weekends regarding the disposition of Margaret's personal property.

On the question of the nieces' disposition to unduly influence their aunt, the Huffeys offered sufficient evidence to create a jury issue. There are numerous contradictions and inconsistencies regarding "the list" as well as the execution of the will. Attorney Morrow did not execute Margaret's will. Rather, he allowed Dorothy and Theresa to execute it in Margaret's hospital room. Testimony regarding the reason for Morrow's absence differs. Dorothy testified he told them he was going to be out of town that day. He testified the nieces told him it wasn't necessary for him to return to the hospital, they would take care of it. Additionally, there is a dispute over whether this will was ever read to Margaret. Dorothy and Theresa state the notary public present at the execution read her the will. The notary testified she would not have read the will, as she does not read out loud the documents she is notarizing.

Finally, the testamentary plan of the two wills is radically different. There is, therefore, substantial evidence to support a conclusion the result was the effect of undue influence. Under the July 16 will, the Lea family became the primary recipients of Margaret Olson's estate. The combined share for the Lea family changed from approximately $13,000 under the June will, to $126,878 in July. George Huffey received the Olson farm, valued at $156,000 under the original will and specific bequests equaling $19,500 under the contested will.

2. Testamentary Capacity. In a will contest, the issue of undue influence and lack of testamentary capacity are so intertwined they are impossible to separate. *Frazier v. State Central Savings Bank*, 217 N.W.2d 238, 243 (Iowa 1974). "Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind. One who is infirm is more susceptible to undue influence than one who is not." *Id.*

We agree with appellants that all the circumstances leading up to and including the July 16th events, coupled with the conduct of the Lea's, raise a jury question as to Margaret's testamentary capacity.

3. Jury Instruction. At the close of the evidence, the Lea family submitted two written instructions and further requested a third orally. However, the requested instructions dealt with matters adequately covered in the instructions given by the court. There was no error in the instructions which were issued to the jury. The trial court was correct in rejecting the instructions submitted by the defendants. *See Miller v. International Harvester,* 246 N.W.2d 298, 307 (Iowa 1976); *Greninger v. City of Des Moines,* 264 N.W.2d 615, 617 (Iowa 1978); and *Osterfoss v. Illinois Central R.R.,* 215 N.W.2d 233, 235 (Iowa 1974).

4. Conclusion. The supreme court is loathe to interfere with a jury verdict and it should not be set aside merely because the reviewing court would have reached a different conclusion. *Sallis v. Lamansky,* 420 N.W.2d 795, 799 (Iowa 1988).

The issues were properly submitted to the jury as there was sufficient evidence to cause reasonable minds to differ. When the entire record is viewed in the light most favorable to the Huffeys, there is sufficient and substantial evidence to support the jury verdict. We reverse the trial court in sustaining defendants' motion for a directed verdict. We also reverse the trial court in granting a judgment notwithstanding the verdict and in ordering a new trial. The jury verdict is reinstated.

REVERSED AND JURY VERDICT REINSTATED.