IN RE ESTATE OF GUY LESLIE ROBERTS.

ORPHA ROBERTS LINKINS et al., appellants, v. BERNICE ROBERTS, appellee.

No. 51928.

(Reported in 140 N.W.2d 725)

MARCH 8, 1966.

882

Bradshaw, Fowler, Proctor & Fairgrave, and Melio A. Tonini, all of Des Moines, for appellants.

Duncan, Jones, Riley & Davis, of Des Moines, for appellee.

MOORE, J.—Testator, Guy L. Roberts, was killed in an automobile accident March 24, 1962, at age 72. He was survived by his wife, Bernice, their son, Guy L. Jr., and ten children of his first marriage.

His will prepared and executed by him on March 5, 1956, leaves all his property in trust until 1988 with the provision the wife have the right to draw such amounts as necessary to maintain the living standards to which she and Guy Jr. were accustomed and expenses for Guy Jr.'s education, including college. It also provides the named trustees, Bernice Roberts and Guy L. Roberts, Jr., three years after his death pay $1000 from the trust funds to each of his children, John M. Roberts, Ruth Roberts Putt, Wilbur Roberts, Wilma Roberts Fletcher, Julia Roberts Danenhauer, Carroll Roberts, Howard Roberts, Orpha Roberts Linkins and Charles Roberts. It states provisions are otherwise made for Cyrene I. Roberts Stillwell outside the will. At the termination of the trust in 1988 all property vests in Guy L. Roberts, Jr.

On March 27, 1962, the wife, Bernice, offered the will for probate. Objections were filed by all children of his first marriage except Howard and Cyrene. They pleaded improper execution of the will, undue influence and mental incapacity.

On trial proponent submitted evidence of proper execution of the will which is undisputed in the record. At the close of contestants' evidence proponent's motion for directed verdict was sustained and judgment entered thereon. Contestants have appealed. They contend a jury question was created on undue influence and mental incapacity.

Lillian Kanealy, testator's secretary at American Farmers Mutual Insurance Companies, where he was an officer, testified testator dictated his will to her on the morning of March 5, 1956, which she typed and delivered to him. Soon thereafter he stated he was ready to sign the will and asked her to get another witness. She asked Wendell R. Steinfeldt, an insurance company employee, to act as a witness. After testator read the attestation clause to the witnesses he signed the will in their presence and they in turn subscribed as witnesses in the presence of each other and the testator. No other person was present. He then instructed Miss Kanealy to take care of the will as he was going out of town. It remained where she filed it in a safe for two years. At testator's request she then returned it to him. After his death the will was found with his personal papers.

The afternoon of March 5, 1956, as planned, testator, his wife Bernice, his son Guy L. Jr. and Mr. and Mrs. Jim Ives left on a trip to Mexico.

Miss Kanealy described testator's appearance, demeanor and composure as normal at the time the will was signed and testified: "I would say that he was of sound and disposing mind." She had worked as a law office secretary for many years before her employment with testator.

Mr. Steinfeldt testified substantially the same as Miss Kanealy regarding the signing of the will. He stated: "I believe Mr. Roberts was in sound mind. * * * Mr. Roberts was very capable and the company was well managed at the time. The company had about fifteen employees and he was in charge of that group." On cross-examination he testified Bernice Roberts also supervised employees at the insurance companies.

Mr. Roberts married Florence Roberts on March 15, 1911. They had ten children whose birth dates range from July 1912 to January 1928. He was divorced from Florence in 1943. Some of the children testified against him in the divorce case. Very unfavorable publicity against him resulted therefrom. During this marriage the family lived on farms near Prairie City, Monroe and Martensdale and later took residence in Des Moines.

Over proponent's objections each contestant related the many beatings administered by testator to his children during

the 1920s and 1930s. He beat them with a rubber hose, razor straps, switches and his fists. Two of the girls sucked their thumbs which he attempted to stop by placing their thumbs on a hot stove or spatula causing blisters. He put electric wires in the bed of two bed wetters. He did not speak to their mother for at least five years before the divorce. Punishment was administered for acts testator felt were improper. They described him as a man who wanted to force his will on them. Julia testified: "When he was not mad he was okay but when he lost his temper he got vicious." Wilbur stated: "We respected him but we feared him." Some of their testimony indicates he was keeping company with Bernice before the divorce.

On cross-examination they testified he had paid tuition for those who attended business and other colleges and that during the 1950s and 1960s he provided employment at the insurance company for Cyrene, John and Charles. He loaned Carroll $7000 to buy a machine needed in his business and also loaned $5000 to John. In 1960 he flew to San Francisco to attend Wilbur's installation as Master of his lodge. On other occasions he visited two of his children in their California homes. In 1955 or 1956 he visited John and his family in Washington.

Subsequent to the divorce in 1943 and up to the testator's death nothing is shown indicating any abnormal, irrational and unnatural behavior on his part toward any of his children. Letters and friendly greetings were exchanged. About two months before his death testator gave his Imperial Chrysler to Charles who was then working for the insurance companies.

Leslie McElderry, now a West Des Moines lawyer, testified he was employed by the insurance companies from January 1938 to May 1940 and that proponent, then Bernice Harper, told him she was the boss and that he was to take orders from her. This was contrary to testator's earlier statements he was the boss. When asked by McElderry about the conflict testator said: "'She runs things, I take orders from her.'" On another occasion McElderry called testator's attention to friction in the office he felt was caused by Bernice in response to which testator said: "'There is nothing I can do about it. She runs the office. That is the way it is and she is boss and runs me and the office.'" This

evidence was taken over proponent's objection of immateriality and remoteness.

Bernice Roberts, the proponent, was called as a witness by contestants. Her testimony shows she began working for the American Farmers Mutual Insurance Companies as a secretary in 1933, and ultimately became an officer of the casualty company and later the life company. For many years she served as office manager. She enrolled in the Des Moines College of Law (night classes) in 1938 and was admitted to the Iowa Bar in October 1942. Testator had also attended the same law school and was admitted to the Iowa Bar in 1938. She was active in the affairs of the insurance companies of which testator was first secretary and later president. He was so serving when killed. She was seriously injured in the same accident.

Prior to her marriage to testator on June 20, 1947, they entered into a prenuptial agreement. She had saved about $10,000 from her earnings. He then owned two farms which were heavily encumbered. She had doubts about the future of the insurance companies.

Guy Jr. was born August 8, 1948. In later years he was his father's constant companion when not in school. In addition to the Mexico trip in 1956 he accompanied his parents on a trip to Hawaii in 1959 and Alaska in 1960. In 1958 testator went to Russia on an agricultural trip following which he showed pictures taken by him to various clubs and churches.

Proponent testified she did not know of the existence of the will prior to testator's death and the matter was never discussed between them.

After testator's death a 1950 will was also found. It being a prior will was revoked by the terms of the 1956 will. It gave his property in trust until 1988 with two thirds of the income to wife Bernice and one third to his daughter Cyrene and the remainder to Guy Jr. Bernice was named trustee. The other children were mentioned, but nothing was left to them.

In 1950 testator became afflicted with diabetes and used insulin during the remainder of his life. In 1953 he fell from a ladder and was hospitalized with three broken ribs and a punctured lung. In 1959 he had erysipelas and later had double

pneumonia. Some contestants felt Bernice failed to promptly advise them of his health problems and indicated dislike of contestants. The record is scant in this regard.

It was stipulated that in March 1956 testator's net worth was $192,000, consisting of two farms, cash, corporate stocks, cash value on life insurance policies, and various items of personal property. During the 1950s, and until his death, testator invested in real-estate contracts and rental properties. He managed these properties and kept meticulous records of his investments. He also made and managed various investments for Bernice and kept the books on them. Contestants in their brief state testator's net worth at the time of his death was $375,000.

From the time the insurance companies were organized until his death testator was active and spent long hours promoting their growth. He called and presided over regular dinner meetings of the employees. At these meetings he lectured on the evils of smoking and drinking and attempted to impose his will on them. He was much concerned with building the companies and retaining control.

Dr. Erle W. Fitz, an osteopathic psychiatrist, was asked a long hypothetical question based on evidence in the record and some assumed facts to which proponent objected as outside the record. The trial court overruled this and other objections made by contestants. We are not asked to review this ruling. Prior to trial the doctor had been furnished a written copy of the question. The doctor answered: "My opinion is that the behavior, thinking and feeling as reflected in this instrument and so far as this hypothetical gentleman is concerned, that he is reflecting the behavior and thinking that is typical of a paranoid personality." When asked whether this hypothetical man would be in the same mental condition on March 5, 1956, the doctor gave no answer. The inquiry was not pursued by contestants.

On cross-examination Doctor Fitz testified:

"Q. But you are not compelled to say, I think, that because a person exhibits some aspects of a paranoid personality that he might not be able to carry on ordinary business activities in a successful way? A. I'm not saying that.

"Q. And if, in fact, the hypothetical man that was described

to you throughout the years down to his death in 1962, at an age of near 72, exhibited ability to transact business, both for the companies by which he was employed and personally in a highly successful fashion, this would be inconsistent of an assumption that he was unable to carry on business activities normally? A. It would be inconsistent with the assumption that he was able to carry on the business activities that obviously he has carried on.

"Q. Would you say that a person having a paranoid personality, as you have used the term, would be capable of knowing the extent and nature of his property? A. Yes.

"Q. And if he were a lawyer, you would not be able to assume from the facts given to you that he did not know what a will is? A. I would assume he would know what a will is.

"Q. And if the fact that he carried on a course of correspondence and visited, at least, occasionally with all of his children, including the ten born of his first marriage, you would not be able to assume from the facts given you that he did not know who his children are? A. He would know who his children are.

"Q. And if as the evidence shows, he was able to transact ordinary business and get along generally in the social world in which he found himself, you would not be able to assume from the facts given to you in the hypothetical question that he would be unable to make a decision as to what he wanted to do with his property in his will, would you? A. Oh, he could make such a decision as to what he wanted to do."

On redirect examination he testified:

"Q. Going back to the hypothetical person that we referred to in your testimony of yesterday, in your opinion, Doctor, does he know and appreciate the nature of his acts? A. Yes.

"Q. Does this hypothetical person know and appreciate the effects of his acts? A. Yes.

"Q. Does this hypothetical person know and appreciate the consequences of his acts? A. Yes.

"Q. Would this hypothetical person reach these conclusions through realistic processes of reasoning? A. No.

"Q. Is this hypothetical person aware of the actual motivations for the conclusions he may draw? A. No.

On re-cross-examination Doctor Fitz testified:

"Q. Dr. Fitz, as I took this down, it is your opinion that the hypothetical man referred to by Mr. Fairgrave would know and appreciate the nature of his acts, the effects of his acts and the consequences of his acts? A. That is right.

"Q. So thus far as to those things, there would be no departure from the normal personality? A. Well, he would be cognizant of these things.

"Q. But it was your opinion that he would not be aware of the motivations for what he does? A. That is right.

"Q. Isn't that true of most of us as to many things we all do? A. I am afraid so."

We have attempted to state most of the facts as they relate to contestants' claim of undue influence by the wife Bernice and lack of mental capacity. Space prohibits stating every detail.

The controlling principles of law applicable to the two issues are well recognized and have many times been stated by this court.

I. Undue influence must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the influence. It must operate at the very time the will is executed and must be the dominating factor. Shaw v. Duro, 234 Iowa 778, 14 N.W.2d 241; In re Estate of Klein, 241 Iowa 1103, 42 N.W. 2d 593; In re Estate of Hadley, 241 Iowa 1280, 45 N.W.2d 140; In re Estate of Ransom, 244 Iowa 343, 57 N.W.2d 89; Olsen v. Corporation of New Melleray, 245 Iowa 407, 60 N.W.2d 832; In re Estate of Dashiell, 250 Iowa 401, 94 N.W.2d 111.

The elements which must be present to justify submission of a case to a jury because of undue influence are: (1) The person be unquestionably subject to undue influence (2) opportunity to exercise such influence and effect the wrongful purpose (3) a disposition to influence unduly for the purpose of procuring an improper favor and (4) the result clearly appearing to be the effect of undue influence. In re Estate of Ankeny, 238

Iowa 754, 28 N.W.2d 414; In re Will of Grahlman, 248 Iowa 535, 81 N.W.2d 673; Olsen v. Corporation of New Melleray and and In re Estate of Dashiell, both supra.

■ Direct proof is not required. Undue influence may be and usually is proven by circumstantial evidence. In re Estate of Telsrow, 237 Iowa 672, 22 N.W.2d 792; In re Estate of Farlow, 243 Iowa 15, 50 N.W.2d 561; Olsen v. Corporation of New Melleray, supra. The evidence, however, must disclose more than a scintilla to justify submission to the jury. In re Estate of Burrell, 251 Iowa 185, 100 N.W.2d 177; Hart v. Lundby, 258 Iowa 46, 137 N.W.2d 642.

■ The burden of proof rests on contestants but in considering the propriety of a directed verdict contestants' evidence must be given the most favorable construction it will reasonably bear. Citations unnecessary. See rule 344(f)2 and (f)5, Rules of Civil Procedure.

■ A careful analysis of all evidence fails to disclose more than a scintilla that testator's will was the result of undue influence exercised by his wife Bernice. The evidence does not create a jury question on this issue.

■ ■ II. On the issue of testamentary capacity the burden is upon contestants to show lack of mental capacity in one of these respects: (1) To understand the nature of the instrument he is executing (2) to know and understand the nature and extent of his property (3) to remember the natural objects of his bounty and (4) to know the distribution he desires to make. If his mental capacity is not equal to any one of these tests he cannot make a valid will. In re Estate of Rogers, 242 Iowa 627, 47 N.W.2d 818; In re Estate of Springer, 252 Iowa 1220, 110 N.W.2d 380; Hart v. Lundby, 258 Iowa 46, 137 N.W.2d 642. And we have often said there must be substantial evidence of mental unsoundness in order to generate a jury question. Proof of mental deficiency must be applicable to the very time of making the will. In re Estate of Springer, 252 Iowa 1220, 1225, 110 N.W.2d 380, 383, and citations.

■ Contestants failed to produce any evidence testator's mental capacity did not meet any of the above stated four tests. In fact Doctor Fitz's "hypothetical man" met each of these tests.

890

The testimony of the two attesting witnesses that testator was of sound mind at the time he made his will is undisputed.

 Failure of contestants to call witnesses, including testator's doctors, who were obviously well acquainted with him about the time he executed his will militates against contestants. In re Estate of Ransom, 244 Iowa 343, 57 N.W.2d 89; In re Will of Grahlman, 248 Iowa 535, 81 N.W.2d 673; In re Estate of Burrell, 251 Iowa 185, 100 N.W.2d 177; Hart v. Lundby, 258 Iowa 46, 137 N.W.2d 642.

 Contestants' disappointment with the provisions of their father's will is understandable but the thought of others that distribution is unequal or even unjust is insufficient basis for a finding of either undue influence or mental incapacity. In re Estate of Klein, 241 Iowa 1103, 42 N.W.2d 593, and citations.

The trial court correctly sustained proponent's motion for directed verdict.—Affirmed.

All JUSTICES concur.