In the Matter of the ESTATE of James LATCH, Deceased.

Delores SLOCUM et al., Contestants-Appellants,

v.

Mrs. L. D. FROMM, Proponent-Appellee.

No. 53096.

Supreme Court of Iowa.

Nov. 12, 1968.

———◆———

William D. Guthrie, Webster City, for contestants-appellants.

Oppen & Wessels, Iowa Falls, for proponent-appellee.

SNELL, Justice.

This is an appeal in a will contest. Proponent, Mrs. L. D. Fromm, is the sole beneficiary and executor of the Will of James Latch, who died March 7, 1966, in Hardin County. Will, dated April 13, 1964, was admitted to probate March 18, 1966. Petition to set aside will was filed by contestants, the sole grandchildren and heirs at law of testator.

Grounds of contest were mental incapacity of testator and undue influence by Mrs. Fromm. During the trial timely motions for directed verdict were made by proponent. Case was submitted to a jury which rendered a verdict setting the will aside on ground of undue influence.

The trial court sustained proponent's motion for judgment notwithstanding the verdict on the ground there was no substantial evidence of undue influence and dismissed the petition. Contestants have appealed.

The sole question presented by the appeal is whether the trial court erred in holding that there was not sufficient evi-

dence of undue influence to raise a jury question.

Contestants urge that the circumstantial evidence of undue influence was sufficient to take the case to the jury and that judgment should be entered on the verdict.

In considering the propriety of the court's ruling we view the evidence in the light most favorable to the party (in this case contestants) against whom the motion is made. Rule 344(f)2, Rules of Civil Procedure.

Decedent, James Latch, was born in 1883 and died March 7, 1966, at the age of 82. His last illness commenced March 1, 1966. Prior to his last illness "his health was pretty good" and "his mental condition was pretty sharp right up to the time of his last illness." The quoted words are from the testimony of his doctor who had treated him at times for many years.

With advancing years his health began to fail and he suffered from paralysis agitans. He was shaky and feeble but he did work around the house doing dishes, helping with meals, small household tasks and in gardening. He took care of a house he owned and collected the rent but except for mentioning the house talked very little about business or personal affairs.

He was frugal and never chewed, smoked or drank. He dressed in work clothes but was neat, clean, shaved and washed. He was uncommunicative, illiterate, (he could sign his name) and had few interests or friends. He would watch television but never selected a particular program.

Mr. Latch and Mr. Caster had been roommates or housemates as roomers for over 20 years. Mr. Caster testified:

"Mrs. Fromm and Jim Latch had arguments once in awhile but I was most generally upstairs. I think the arguments were about Mrs. Fromm trying to tell Jim what to do. You couldn't tell him very much or he'd be on his toes. He sure was a strong-minded individual."

For about 10 years prior to 1944 Mr. Latch had worked for Mr. and Mrs. Fromm as a farmhand. About 1944 the Fromms moved from the farm to Iowa Falls. Mr. Latch moved with them and boarded and roomed in the Fromm home until his death in 1966. He paid $2.50 per week.

Decedent had been married but was divorced in the 1930's. His wife just departed leaving a note for him saying she would not be back. He obtained a divorce and thereafter was quite bitter toward his former wife. He was very apprehensive of seeing her.

Decedent had one daughter who married a Mr. Slocum in about 1933. The testimony as to early events in the family life gave only approximate dates. Mrs. Latch left decedent the day after the daughter's wedding and reportedly went with the newly married Slocums on their honeymoon.

Mrs. Slocum died in 1953. Her husband died before that.

Four children, three sons and one daughter, of the Slocums survive and are the contestants herein.

Mr. Slocum was a minister of the Open Bible and the family moved frequently. There is no evidence of any contact with Mr. Latch until after Mr. Slocum died. The family then moved to Des Moines.

The contacts of the Slocum sons with Mr. Latch have always been minimal with few, if any, for many years. They were widely scattered and were not present at the trial.

Delores Slocum, granddaughter, testified in substance as follows:

Prior to her mother's death in 1953 Mrs. Slocum took the children to visit their grandfather a few times a year. Mr. Latch attended his daughter's funeral in 1953.

For the next 2 or 3 years Delores did not see her grandfather. She had no car.

After she got her own car she visited him about twice a year when she could. During the period after she got a car, about a 10-year period, she got to see him 10 to 14 times. She couldn't always get to see him unless he was outside when she drove by, because if she phoned, local or long distance and asked for him, Mrs. Fromm would answer, say Jim wasn't there and hang up. This happened even when Delores knew Jim was at home. Finally she adopted the expedient of having her uncle Nelson Lord phone and ask for Jim. When Jim answered, Delores would then arrange to drive by to pick him up and he'd meet her outside. They would then go for a ride, or to the park, once to Nelson Lord's, and stop for coffee. On these occasions, Jim always appeared to enjoy himself, and to be fond of Delores, telling her, on occasion, that she was his favorite. He always kissed her on the cheek. He told her of arguments with Mrs. Fromm.

Jim would refuse to go any place because he was afraid he might see his former wife, Delores' grandmother.

Invariably, when it was time to go home Jim would insist Delores let him off out of sight of the house so that Mrs. Fromm wouldn't see him.

A couple of years before his death, Delores tried to leave a Christmas present for him, but Mrs. Fromm wouldn't let her leave it.

The last time Delores saw her grandfather, about a year before he died, Mrs. Fromm said he wasn't there, but Delores had seen him and insisted. Then Mrs. Fromm said Jim didn't want to see her. Delores tried to get past, saying she wanted him to tell her that. Jim stood behind Mrs. Fromm signaling that he couldn't talk to her because of Mrs. Fromm.

Mr. Caster, decedent's housemate, testified that Jim seemed to like Delores and never said anything against her. There is no evidence that decedent felt any animosity against his grandchildren. Neither is there any evidence except as we have related that he expressed any feeling of obligation toward them. There is no evidence that he ever did anything for them or they for him.

Decedent's younger brother visited him in the Fromm home 2 or 3 times a year. He testified: "I don't think Jim was the type of man you could bully around. Never said anything to indicate he feared Mr. or Mrs. Fromm."

Decedent kept money in an envelope in his trunk. A niece of decedent's saw him twice a year. She testified:

"About a year and one-half or two years before his death I talked with Jim about the trunk. He said he had a trunk up there and he had a little money in it. He said around $6000. It came up because he was kind of lonesome and liked to talk and tell me his troubles. We were talking about the house that he bought next door to Mrs. Fromm and what he gave for it."

A daughter of proponent testified:

"Jim told me that there was an envelope with some money in his trunk and that my mother was to have it for taking care of him and he made me promise faithfully to get it out and give it to her which I did. When he died I didn't count it exactly but there was between $200 or $300 which I gave to mother. The only other thing I noticed in the trunk was a red blanket."

The inventory listed only the following property in the estate: real property, value $12,000; bank account $16.86, Investor's Mutual Shares $ 6,347.96.

Decedent's will reproduced in the record to show decedent's shaky signature was executed April 13, 1964 and provided:

"I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed, of whatsoever nature and wheresoever situated, to which I may be entitled or which I may own and any estate which I may have power to dispose of at my death, which has not been hereto-

fore disposed of, to Mrs. L. D. Fromm who has provided a home for me for over forty years and cared for me during times of sickness."

Mrs. Fromm was nominated executrix without bond.

The only evidence as to the execution of the will was by the secretary of the attorney who drafted the will. We quote:

"I worked for Oppen and Wessels for three years and had occasion to be acquainted with James Latch. Exhibit 'A' is the last will and testament of James Latch. These are the signatures of DuWayne J. Wessels and my own made at Mrs. Fromm's home together with Mr. Latch's signature. All three of us were present when the signatures were affixed. Mrs. Fromm and another woman were in another room. I drove out to the Fromm residence with Mr. Wessels. When we got to the Fromm residence Mr. Wessels introduced me to Mr. Latch and he read the instrument and Mr. Latch signed it and we witnessed it. Mr. Wessels and I both signed it and Mr. Latch appeared to comprehend the document. I had not seen Mr. Latch before. I was introduced to Mrs. Fromm that day. She was in another room from where we were. * * *"

This appears from the cross-examination:

"The Will had been prepared and typed by me and we drove out from the office. * * *

"When we came to the Fromm house Mr. Latch was seated in a chair at the table awaiting us. I don't remember if we phoned to let them know we were coming. I believe Mrs. Fromm let us in and then retired to an adjoining room. I don't remember if she closed the door when she left. There was no conversation other than the introduction to Mrs. Fromm before she left. I had never met her before. * * *

"Mr. Wessels and I both stood while Mr. Wessels talked with Mr. Latch in a general manner. This was on April 13, 1964. Mr. Wessels then read the Will to Mr. Latch and asked him if this was his last Will and Testament and told him where to sign it. Then the paper was placed on the table and Mr. Latch signed it. I don't recall that Mr. Latch said anything at the time. The pen marks on the signature line is the signature of James Latch. I think you could make out what it was. He was quite shaky with his signature. He said he was nervous. After he signed the first time it was easier the second time. * * * I believe Mr. Wessels visited with Mr. Latch before the Will was dictated to me. I don't know if there were any telephone conversations about it. There wasn't any other work done for Jim Latch in the Oppen and Wessels office during the time that I worked there so far as I know. Nor was there for Mrs. Fromm. We were at the Fromm residence that day to sign the Will for about ten or fifteen minutes and
(sic)
left immediately *that* the Will was finished. * * *"

The case was submitted to the jury on two special verdicts. The jury's verdicts were as follows:

"We find that contestants have not established their charge of mental incapacity.

"We find that contestants have established their charge of undue influence."

On proponent's motion for judgment notwithstanding the verdict the trial court reviewed the testimony, determined that there was no substantial evidence of undue influence, sustained the motion and dismissed the contest.

We affirm.

I. Decedent's relatives were not welcome in proponent's home. The evidence might support suspicion as to motive. Certainly during the more than 30 years that decedent lived in the Fromm home there was opportunity to exert influence. That, however, is not enough. Decedent apparently did as he pleased. He got around

and took care of his own business. He was not lacking in testamentary capacity. He was a "strong-minded individual."

There was no evidence that at the time the will was executed any outside influence was substituted for his own desire. Contestants' case fails for lack of evidence.

We noted, supra, the lack of evidence surrounding the execution of the will. We quote from the trial court's ruling:

"Contestants make much of the fact that proponent and the scrivener did not testify. Proponent counters she could not testify that testator told her he wanted her to have his property, because of the dead man statute. * * * Further, that on the morning of the trial contestants moved to exclude the scrivener as attorney in the case on the basis of professional ethics—and that would include his partner too—and the scrivener elected to remain in the case because of the lateness of the hour.

"However, that may be, the failure of those individuals to testify does not meet contestants' basic problem—the absence of evidence of undue influence. Failure of a witness to testify may be argued to a jury as strengthening evidence which is actually in a case, but first there must be that evidence. Failure of a witness to testify is not evidence. As we sometimes instruct juries, 'Failure of this individual to testify may be considered by you, but such failure is not itself evidence.'"

We express no opinion as to the competency of witnesses or admissibility of their testimony had they been called. Why they were not called we do not know, but we agree with the trial court that the circumstances and suspicion were not enough to support a jury verdict of undue influence.

II. Will contests have been so numerous and the principles of law incident thereto so well settled that extensive review thereof is unnecessary. We will mention only a few of our more recent pronouncements.

In Hart v. Lundby, 258 Iowa 46, 56, 137 N.W.2d 642, 648, we said:

"Undue influence is not established by proof of opportunity and disposition to exercise it. Importunity, request and persuasion that do not control the will are not enough."

In re Estate of Roberts, 258 Iowa 880, 888, 889, 140 N.W.2d 725, 730, says:

"Undue influence must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the influence. It must operate at the very time the will is executed and must be the dominating factor. [Citations]

"The elements which must be present to justify submission of a case to a jury because of undue influence are: (1) The person be unquestionably subject to undue influence (2) opportunity to exercise such influence and effect the wrongful purpose (3) a disposition to influence unduly for the purpose of procuring an improper favor and (4) the result clearly appearing to be the effect of undue influence. [Citations]

"Direct proof is not required. Undue influence may be and usually is proven by circumstantial evidence. [Citations] The evidence, however, must disclose more than a scintilla to justify submission to the jury. [Citations] * * *"

In re Estate of Tomin, Iowa, 152 N.W. 2d 286, 291, says:

"In a will contest case the evidence must disclose more than a scintilla of evidence to justify the trial court in submitting a case to the jury. [Citations] In In re Estate of Kenny, 233 Iowa 600, 605, 10 N. W.2d 73, 76, we said: 'This court is committed to the doctrine that a mere scintilla of evidence will not sustain the burden of proof.' In Bales v. Bales, 164 Iowa 257, 276, 145 N.W. 673, 680, we announced the rule since followed in this jurisdiction and

said: 'It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence in support of the case, but it is now settled that the question for the judge is, not whether there is literally no evidence, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established.' "

III. In the case before us the evidence was insufficient to support a verdict of undue influence.

The trial court was right.

The case is

Affirmed.

All Justices concur.