**IN THE COURT OF APPEALS OF IOWA**

No. 23-0495
Filed August 7, 2024

IN THE MATTER OF THE ESTATE OF NABIL ANTON KHABBAZ, Deceased.

**ANTON NABIL KHABBAZ,**
    Appellant,

**vs.**

**RAWAN A. KHABBAZ, Individually and in her capacity as Executor of the ESTATE OF NABIL ANTON KHABBAZ, and A.A.K.,**
    Appellees.
_____

Appeal from the Iowa District Court for Johnson County, Andrew Chappell, Judge.

Anton Khabbaz appeals the entry of summary judgment in favor of Rawan Khabbaz on his claims of undue influence, lack of testamentary capacity, and tortious interference with an inheritance. **REVERSED AND REMANDED.**

Thomas E. Maxwell of Leff Law Firm, L.L.P., Iowa City, for appellant.

Kevin J. Visser of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellee.

Considered by Schumacher, P.J., and Langholz, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**SCHUMACHER, Judge.**

Anton Khabbaz appeals the entry of summary judgment in favor of Rawan Khabbaz on his claims of undue influence, lack of testamentary capacity, and tortious interference with an inheritance. We find there are genuine issues of material fact to show Nabil Khabbaz was susceptible to undue influence and that there are genuine issues of material fact concerning whether the "result clearly appeared to be the result of undue influence." These genuine issues of material fact make summary judgment on Anton's claims inappropriate. We reverse the decision of the district court and remand for further proceedings.

### I.     Background Facts & Proceedings

Nabil had two children, Anton and Rawan. At the times relevant to this appeal, Nabil lived in Iowa City. Anton lived in New Jersey. Rawan lived in Massachusetts. As Nabil got older, he experienced health problems, including metastatic cancer and macular degeneration. He was not able to fully live independently.

In July 2020, Nabil changed the beneficiaries of his retirement account to Rawan and her daughter, A.A.K., instead of Rawan and Anton, who had been the previous beneficiaries. In December 2020, Nabil, or someone on his behalf, contacted an attorney to draft a will for him. On February 18, 2021, Nabil signed a will giving the bulk of his estate to Rawan and A.A.K. The will provided:

> I have great affection for my son, Anton Nabil Khabbaz and for my granddaughters [L.K.] and [C.K.]. Anton holds an advanced degree in physics. He is financially independent and he has sufficient employment prospects. [L.K.] and [C.K.] are successful in their own right and are well-prepared for college. Owing to my son's career opportunities and financial standing, his desire to seek or ask for more from me than what has been given to him during my lifetime,

and because of professional opportunities and earning potential that are available to him, I have intentionally omitted him, [L.K.] and [C.K.] as beneficiaries of my residuary estate property.

For those reasons, it is my specific intent that neither Anton, nor [L.K.] and [C.K.] receive property from my estate, except as specifically set forth in this Last Will and Testament and as may be specifically designated to them by beneficiary designation of an account or policy that passes outside of this Last Will and Testament.

The will left Anton a condominium in Iowa City. The will also provided Anton's children, L.K. and C.K., funds to assist with a college education.[1] Rawan and her daughter, A.A.K., were given the remainder of Nabil's assets, a change from Nabil's previous will that treated his children equally.

Nabil died on July 28, approximately five months after he executed his will. Rawan was appointed as the executor of his estate. At the time of his death, Nabil had assets worth about $19 million. The condominium awarded to Anton was valued at $166,700. The educational accounts for Anton's children had a combined value of about $720,000.

Anton filed a petition to set aside the will. He claimed Rawan had engaged in undue influence over Nabil, Nabil lacked testamentary capacity at the time the will was executed, and Rawan tortiously interfered with his inheritance.

Rawan filed a motion for summary judgment, asserting that Anton was unable to prove his claims. She attached a statement of undisputed facts to show that on September 2, 2020, Nabil came to the emergency room at a local hospital with an altered mental state. Nabil had fecal incontinence. He had not been eating

---

[1] At the time of trial, Anton was employed as a tutor and looking for employment in the computer science field. His physics degree was obtained prior to the execution of his father's 2001 will. Although the will stated that A.C. and L.C. were successful in their own right and well-prepared for college, at the time of the execution of the will they would have been nine and seven years old, respectively.

properly. Rawan was concerned he was not taking his medication. Nabil was diagnosed with pneumonia. On September 4, he gave Rawan the right to make health decisions under a medical power of attorney. Nabil's medical records at the time of his discharge from the hospital on September 10 show Rawan told hospital staff Nabil had returned to "baseline". Hospital notes state Nabil was "fully oriented. Remote and recent memory intact."

In a deposition, Rawan stated that in December 2020 or January 2021, Nabil asked her to have his mail forwarded to her home. She testified Nabil was able to make his own decisions. Rawan stated Nabil contacted the drafting attorney and she was not involved in that decision. Rawan presented the deposition of Christina Jordan, Nabil's home health care provider. Jordan stated Nabil made independent decisions. She stated Nabil met alone with an attorney in November or December 2020. Also, in a deposition, the attorney that drafted the will stated that he met with Nabil alone. The attorney testified that he had no concerns about Nabil's mental capacity or about undue influence. Nabil told him he "had over five million dollars."

Rawan also presented a portion of Anton's deposition. Anton stated Rawan would say one thing to him and another to Nabil. He asserted that he heard Rawan disparage him to Nabil. Anton testified that Nabil went in and out of lucidity and was vulnerable. Anton stated that when Nabil was in the hospital in September 2020, he came to visit Nabil but he was prohibited from visiting Nabil on some days, and he believed this was due to action by Rawan. Anton was asked:

> Q. On July 17th or 18th, 2020, are you aware of any mental disability that your father was under? A. He was having a very difficult time controlling his life needs at that time. At that time Rawan

stepped in, took over his mail and also he was not able to control his bowels. He was not able to feed himself. He was not able to even stay awake for most of the day. He was not able to be independent.

Anton testified Rawan agreed with him that Nabil had slurred speech in October or November 2020.

Anton resisted the motion for summary judgment. He stated he did not accept or agree with Rawan's statement of undisputed facts. Anton asserted there were genuine issues of material fact on all of his claims, and he filed a statement of disputed facts to support his claim that summary judgment was inappropriate.[2] He included an affidavit of Diana Khabbaz, Nabil's former wife and the mother of Anton and Rawan. She stated that at times she was present when Rawan and Nabil communicated by telephone. Diana stated:

> From my communications with Rawan, I understood that in July 2020, Nabil was very sick and had a stage four cancer diagnosis; he knew he was going to die relatively soon. He was alone without family in Iowa City, Iowa. He was in pain, desperate, and afraid. He would change his mind on important matters frequently. As a result of all of this, he was mentally unstable.

Diana asserted Rawan had access to Nabil's cell phone records and email. She stated Rawan was financially dependent on Nabil to pay expenses for herself and her child.

Anton submitted a copy of an email he sent to Rawan on August 20, 2020, stating he and his children had called Nabil, "[b]ut [Nabil] mistakenly thought that you were speaking with him, not me, though I identified myself." Anton attached

---

[2] As noted by the district court, rather than respond to Rawan's statement of facts, Anton filed his own statement of facts and a general denial of Rawan's statement of undisputed facts.

photographs of the state of Nabil's home, which included fecal material in the bathroom and down the hallway.

Anton also included copies of text messages showing Rawan's concern about a decline in Nabil's neurological functioning. On April 12, 2019, Rawan stated, "think he is regressing to child issues." On November 18, 2019, Rawan stated, "I'm not really sure and he[']s been acting a little bit manic lately." On December 1, 2019, Rawan stated, "He has problems," "I tried, really I did . . . he can[']t hear reasoning . . . he only heard his own ways," and "He talks to himself at night u know." In 2020, Rawan texted that Nabil's "house is filthy and there's no food." On August 29, 2020, she stated, "Are you and I know how he lives I think the other people are a palled I mean he soiled everywhere he pulled everywhere," and that Nabil was "very weak and very frail." Rawan told Anton, "Please don[']t worry or fret . . . nothing will change or move if it does I will tell you."

Anton presented a medical report from August 24, 2020, noting concerns that Nabil was not getting out of bed, was soiling himself, not eating or drinking enough, and not taking his medications correctly. At that time Nabil agreed to have a home health aide assist him. On September 1, the home health aide stated Nabil could not get out of bed and was not eating or drinking. Nabil was diagnosed with pneumonia and admitted to the hospital the next day. A medical report from September 2 notes, "Looking at chart review this patient's daughter has serial phone encounters with medical oncology regarding his overall daily level of functioning and neurocognitive decline over the previous 2 months," and, "The patient keeps in regular contact with his daughter who lives in Boston and she has

noticed precipitous neurocognitive decline and overall malaise over the previous few months and has called into medical oncology clinic seeking direction."

Rawan replied to Anton's resistance. She asserted Anton did not provide any evidence of Nabil's mental state at the exact time he changed the beneficiaries of his retirement accounts, in July 2020, or when he signed his will, in February 2021.

Without hearing, the district court granted the motion for summary judgment. The court found "[Anton] has offered no specific facts establishing any genuine issue of material fact on any of these issues." The court concluded there were no genuine issues of material fact to preclude the entry of summary judgment. Anton appeals the decision of the district court.

## II.      Standard of Review

We review a district court's decision granting summary judgment for the correction of errors of law. *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2013).

## III.      Summary Judgment

A party seeking summary judgment has the burden to establish there are no genuine issues of material fact. Iowa R. Civ. P. 1.981(3); *Morris v. Steffes Group, Inc.*, 924 N.W.2d 491, 496 (Iowa 2019). There is a genuine issue of material fact "if reasonable minds can differ on how an issue should be resolved." *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018). The facts are viewed in "the light most favorable to the party resisting the summary judgment motion." *Buboltz v. Birusingh*, 962 N.W.2d 747, 754 (Iowa 2021).

"[T]o successfully resist a motion for summary judgment, the resisting party must set forth specific evidentiary facts showing the existence of a genuine issue of material fact." *In re Est. of Henrich*, 389 N.W.2d 78, 80 (Iowa Ct. App. 1986). A party cannot rest on mere allegations or a denial of the pleadings. Iowa R. Civ. P. 1.981(5). "If the summary judgment record shows that the 'resisting party has no evidence to factually support an outcome determinative element of that party's claim, the moving party will prevail on summary judgment.'" *R.J. Meyers Co. v. Reinke Mfg. Co.*, 885 N.W.2d 429, 435 (Iowa Ct. App. 2016) (quoting *Wilson v. Darr*, 553 N.W.2d 579, 582 (Iowa 1996)).

"Although our rules of procedure allow a nonmoving party to resist summary judgment, the burden is still on the moving party 'to show the district court that there was no genuine issue of material fact and that it was entitled to a judgment as a matter of law.'" *Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 27 (Iowa 2005).

### IV.     Undue Influence

Anton contends the district court improperly granted summary judgment on the claim of undue influence. To prove undue influence, a party must show (1) the testator was susceptible to undue influence, (2) a beneficiary had the opportunity to exercise such influence, (3) the beneficiary had a disposition to influence the testator to gain an advantage, and (4) the result clearly appears to be the result of undue influence. *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003).

Direct proof of undue influence is not required. *In re Est. of Roberts*, 140 N.W.2d 725, 730 (Iowa 1966). "Undue influence is usually 'established by circumstantial evidence and may be and often is based upon a cumulation of many

factors.'" *Boehm v. Allen*, 506 N.W.2d 781, 784 (Iowa 1993) (quoting *In re Est. of Dashiell*, 94 N.W.2d 111, 114 (Iowa 1959)). "It must operate at the very time the will is executed and must be the dominating factor." *Roberts*, 140 N.W.2d at 730.

There must be more than a "scintilla" of evidence to generate a genuine issue of material fact on the issue of undue influence. *Henrich*, 389 N.W.2d at 81. "Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be *a solid foundation of established facts upon which to rest an inference of its existence*." *In re Est. of Bayer*, 574 N.W.2d 667, 671 (Iowa 1998). Any time a will provides for other than an equal distribution, a disappointed heir could claim an inference of undue influence and a corresponding fact question because reasonable minds could always differ about the purpose of the distribution. But such a position would have the effect of giving a factfinder a carte blanche to rewrite most wills. Second-guessing should not be permitted to void a will that complies with established guarantees of trustworthiness. *In re Est. of Davenport*, 346 N.W.2d 530, 533 (Iowa 1984).

Rawan's motion for summary judgment addressed only the first and fourth elements.[3] "Summary judgment is properly granted when the moving party shows 'the nonmoving party has no evidence to support a determinative element of that party's claim.'" *Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 362 (Iowa 2014) (quoting *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 542 (Iowa 2006)). In order to be successful on a claim of undue influence, Anton would need to prove all four

---

[3] Anton's resistance points out that Rawan did not dispute the second or third elements. Rawan's reply to Anton's resistance did not challenge Anton's statement. We conclude Rawan has conceded there are genuine issues of material fact concerning the second and third elements.

elements. As the district court considered only the first and fourth elements, we address only these two elements.

**A.** On the first element, "undue influence means a substitution of the will of the person exercising the influence for that of the testator." *Dashiell*, 94 N.W.2d at 114. A person "who is infirm and mentally weak is more susceptible to influence than one who is not." *Boehm v. Allen*, 506 N.W.2d 781, 784 (Iowa Ct. App. 1993). The natural circumstances of aging do not show a testator is "infirm or mentally weak," so as to be more susceptible to undue influence. *Randall L. Durschmidt Revocable Tr. v. Durschmidt*, No. 22-0102, 2022 WL 5074672, at *3 (Iowa Ct. App. Oct. 5, 2022). "This, however, does not mean the testator must lack competency for the issue of undue influence to be submitted to the jury." *In re Est. of Gray*, No. 08-2005, 2009 WL 5125485, at *6 (Iowa Ct. App. Dec. 30, 2009).

> The district court stated:

> [Anton] has not offered evidence of any observations he made regarding [Nabil's] condition at or near the time the beneficiary designations were made and the Will was executed. On the other hand, [Rawan has] provided medical records showing that, at visits immediately prior to and subsequent to the beneficiary designations being made in July 2020, [Nabil] was alert and oriented. The medical records also show that [Nabil] was making his own health care decisions and declined a power of attorney.

But concerns about Nabil's mental state did not begin in July 2020. In text messages in 2019, Rawan stated Nabil was "regressing to child issues." She also stated Nabil had been "acting a little bit manic lately." She texted that Nabil could not "hear reasoning."

Anton submitted medical records that directly contradict a finding that Nabil was alert and oriented in July 2020. A medical record from September 2, 2020,

stated Rawan had been concerned about Nabil's "neurocognitive decline over the previous 2 months," and also that she "ha[d] noticed precipitous neurocognitive decline and overall malaise over the previous few months." By stating she had a concern about Nabil's mental state two months earlier than September 2020, Rawan is stating she had a concern in July 2020, when the beneficiary designations were made. We find there is a genuine issue of material fact on the issue of Nabil's mental state in July 2020.

Questions about Nabil's mental state continued past July 2020. In August 2020, Anton called Nabil but Nabil mistook him for Rawan, although Anton identified himself. Later in August there were concerns that Nabil was not getting out of bed, not eating or drinking enough, not taking his medications correctly, and was soiling himself. As noted, Nabil was in the hospital with an altered mental state early in September. There was evidenced Nabil had returned to "baseline" by the time he left the hospital and was "fully oriented." In a deposition, Anton testified Rawan agreed with him that Nabil had slurred speech in October or November 2020. Anton testified that Nabil went in and out of lucidity and was a vulnerable person.

Given the evidence of continued concerns about Nabil's mental state from 2019, through October or November 2020, we find there are genuine issues of material fact concerning his mental state when he first met with the attorney in December 2020 and signed the will in February 2021. *See In re Est. of Secrist*, 186 N.W.2d 665, 667 (Iowa 1971) (noting "evidence of the condition of the mind of the testator at other times may be received if there is a reasonable basis for the conclusion that it throws some light on his mental competence at the time his will

was made"); accord *In re Est. of Gruis*, 207 N.W.2d 571, 573 (Iowa 1973). "In a will contest, weight and credibility of the evidence are questions for a jury." *Bayer*, 574 N.W. 2d at 670–71.

**B.** The other element at issue is whether the result clearly appears to be the result of undue influence. *See Mendenhall*, 671 N.W.2d at 454. Undue influence "cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was not only present but that it was in fact exerted with respect to the making of the testament itself." *Davenport*, 346 N.W.2d at 532.

The Iowa Supreme Court has stated:

The injection of the word "clearly" into the fourth element of undue influence is designed to add a measure of protection to the free will of a testator, filter out claims that are unduly speculative, and to prevent the doctrine from expanding beyond its limited scope. All of the other elements of undue influence might be present— susceptibility, opportunity, and disposition—and, still, the will provisions might be the result of the testator's free will.

*Burkhalter v. Burkhalter*, 841 N.W.2d 93, 105–06 (Iowa 2013). "[U]ndue influence must dominate the motives of the testator in executing his will. It must be the equivalent of 'moral coercion.'" *Id.* at 106 (quoting *Davenport*, 346 N.W.2d at 532).

"Because direct proof is rarely available in such contests, undue influence may be proven by circumstantial evidence." *In re Est. of Dankbar*, 430 N.W.2d 124, 128 (Iowa 1988) (citing *In re Est. of Herm*, 284 N.W.2d 191, 201 (Iowa 1979)). It is rare when direct evidence of undue influence is available. *In re Est. of Cory*, 169 N.W.2d 837, 843 (Iowa 1969). "Unnatural, unjust, or unreasonable distributions may be properly considered." *Dankbar*, 430 N.W.2d at 128; *accord In re Est. of Dilley*, No. 10-0938, 2011 WL 2695757, at *3 (Iowa Ct. App. July 13,

2011); *Goche v. Goche*, No. 09-0761, 2010 WL 2925140, at *4 (Iowa Ct. App. July 28, 2010); *Gray*, 2009 WL 5125485, at *6.

Anton presented evidence to show that under Nabil's previous will Nabil's assets were equally distributed between his two children. Under the current will, Rawan receives about ninety-five percent of Nabil's estate, while Anton receives about five percent, which could be considered unjust. *See Dankbar*, 430 N.W.2d at 128.

"In order to support the burden of proof of undue influence, it is generally insufficient for the contestant to merely show inequality of distribution under the will, although that fact combined with other circumstantial evidence may support a verdict in contestant's favor." *Davenport*, 346 N.W.2d at 532. In addition to evidence of inequality of distribution, Anton testified in his deposition that he directly heard Rawan disparaging him "in a very harsh way" to Nabil. Anton testified Rawan would say one thing to him and another to their father and her statements were inconsistent with her actions. For instance, Rawan texted Anton that if things changed she would let him know but when Nabil changed the beneficiaries of his retirement accounts, she did not tell Anton, stating in her deposition "[t]hat was between my father and my brother." Anton believed Rawan tried to keep him from Nabil. While Nabil was in the hospital Anton was not permitted to see Nabil every day. Anton testified that when he did see Nabil they had a nice, warm relationship, so he did not believe Nabil was prohibiting him from visiting. Anton also stated he believed Rawan misled Nabil about her financial situation so that he would continue to support her.

We conclude Anton presented sufficient evidence to generate a genuine issue of material fact on whether the result clearly appears to be the result of undue influence. *See Mendenhall*, 671 N.W.2d at 454. We determine summary judgment was improperly granted on the claim of undue influence.

## V. Testamentary Capacity

Anton contends the district court should not have granted summary judgment to Rawan on his claim that Nabil lacked testamentary capacity. In order to have testamentary capacity, a person must know (1) the nature of the instrument being executed; (2) the nature and extent of the person's property; (3) the natural objects of his bounty; and (4) the disposition he desired to make under his last will and testament. *In re Est. of Lachmich*, 541 N.W.2d 543, 545 (Iowa Ct. App. 1995).

"The issue of undue influence in a will contest cannot be separated from that of testamentary capacity." *Cory*, 169 N.W.2d at 843 (quoting *In re Est. of Telsrow*, 22 N.W.2d 792, 796 (Iowa 1946)). "In a will contest, the issue of undue influence and lack of testamentary capacity are so intertwined they are impossible to separate." *In re Est. of Olson*, 451 N.W.2d 33, 36 (Iowa Ct. App. 1989).

We have already determined there are genuine issues of material fact concerning Nabil's mental state. We review the facts in "the light most favorable to the party resisting the summary judgment motion." *Buboltz*, 962 N.W.2d at 754. There is a genuine issue of material fact, making summary judgment inappropriate, "if reasonable minds can differ on how an issue should be resolved." *Banwart*, 910 N.W.2d at 544. For the reasons discussed concerning Nabil's mental state in our discussion of the claim of undue influence, we conclude the district court should not have granted summary judgment on the claim of lack of testamentary capacity.

**VI.    Tortious Interference with an Inheritance**

Anton asserts the district court should not have granted summary judgment to Rawan on his claim of tortious interference with an inheritance.  Tortious interference with an inheritance arises when (1) the plaintiff had a reasonable expectation of receiving an inheritance or gift; (2) the defendant committed an intentional and independent legal wrong; (3) the defendant's purpose was to interfere with the plaintiff's expectancy; (4) the defendant's conduct caused the expectancy to fail; and (5) the plaintiff suffered economic loss as a result.  *Buboltz*, 962 N.W.2d at 753 (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 19, at 160–61 (Am. L. Inst. 2020)).

There is a substantial overlap between a cause of action based on tortious interference with an inheritance and one based on undue influence.  *Youngblut v. Youngblut*, 945 N.W.2d 25, 36–37 (Iowa 2020).  For both claims, "the plaintiff must prove an outsider overcame the testator's independent will."  *Id.* at 36.

Anton relies on evidence relating to his claim of undue influence to support his claim of tortious interference with an inheritance.  We conclude that if there are genuine issues of material fact on the claim of undue influence then there are also genuine issues of material fact on the claim of tortious interference with an inheritance.  We conclude summary judgment was inappropriately granted.

We reverse the grant of summary judgment and remand for further proceedings.

**REVERSED AND REMANDED.**

Bower, S.J., concurs; Langholz, J., dissents.

**LANGHOLZ, Judge** (dissenting).

The majority makes a good case for how Anton Khabbaz *could have* marshalled the summary-judgment record to show a genuine dispute of material fact that survives his sister's motion for summary judgment and gets him to trial. But Anton did not make that case in the district court. And for at least some of the disputed facts the majority discovers, he did not make the case here either. Nor has he ever offered any independent analysis of his distinct lack-of-mental-capacity and tortious-interference-with-inheritance claims. So while the majority's reasoning may feel satisfying, appellate courts are bound by fundamental principles of the adversarial process and appellate review to consider only the arguments made in and decided by the district court. And so limited, I cannot say that the district court erred in holding that Anton failed to show any material factual dispute. I would thus affirm the district court's grant of summary judgment and dismissal of this case.

I.

Anton brings his undue-influence and lack-of-mental-capacity claims to set aside two actions of his father seven months apart: Nabil's execution of his will in February 2021 and his retirement beneficiary designations in July 2020. In her summary judgment motion, Rawan argued that Anton had failed to put forth any evidence from which a jury could find he had proved either claim for either action. Both claims require a focus on "the very time the will" or other document "is executed." *In re Est. of Roberts*, 140 N.W.2d 725, 730 (Iowa 1966); *see also id.* ("Proof of mental deficiency must be applicable to the very time of making the will."). So we must consider the evidence about each time period separately.

*The Will (February 2021).* Turning first to the easiest time period to address, both the undue-influence and lack-of-mental-capacity challenges to the will fail because Anton pointed to no evidence creating a disputed fact about Nabil's mental capacity or susceptibility to influence at the time he executed the will in February 2021. Indeed, Anton made no arguments in the district court about this time at all. His arguments there focused on the period before the July 2020 beneficiary designations and up to September 2020. And as Rawan correctly argues, the evidence shows that any mental issues that could have supported a finding of lack of capacity or susceptibility to undue influence in the summer 2020 had resolved by the time of Nabil's release from the hospital in September 2020. That evidence includes:

- Medical records stating that by his September 10 discharge from the hospital, Nabil's "mental status returned back to baseline," he was "fully oriented" and his "[r]emote and recent memory [was] intact."

- Deposition testimony from the experienced attorney, Mel Shaw, who drafted the will that during the many times he met at length with Nabil about the will—before, at, and after its execution—that he had no concerns about Nabil's understanding of the will or his finances, explaining "he was conscientious and he took his time, and I could tell that no one could pressure Mr. Khabbaz into doing anything. And he even told me that."

- A declaration from the home health aide who began caring for Nabil after his September discharge that "Nabil was fully aware of his assets down to the cent," "was independent," and "had the ability to make and understand his will."

In the district court, Anton pointed to nothing that disputed this evidence about Nabil's mental capacity and susceptibility to influence from September 2020 until the execution of the will in February 2021. Not in his single paragraph of fact-specific argument in his resistance.[4] And not in the four pages of his "Statement of Disputed Facts," which was not really a statement of disputed facts at all—but I'll come back to that problem in just a bit. So it's no wonder that the district court concluded that Anton had failed to show any material fact dispute on his challenges to the will. And we should be affirming that decision without much difficulty.

On appeal—for the first time—Anton highlights Shaw's testimony that, at one of their first meetings, Nabil said that "he had over 5 million dollars" in assets. And Anton claims that this shows "Nabil did not understand the full extent of his assets" since "he passed away owning close to nineteen million in assets." It appears the majority does not rely on this testimony in its analysis. And properly so, since "[i]t is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

---

[4] The one paragraph applying the law to the evidence in the record said in full:

> Plaintiff has provided evidence of Nabil's susceptibility. Medical records from close in time when Nabil made the beneficiary designations and when he worked with Attorney Melvin Shaw to change his Will reflect physical weakness, pain, as well as mental instability. The records also show Rawan had concern about decline in Nabil's neurological functioning well before the Nabil's hospitalization in September 2020. Text messages between Anton and Rawan also show Rawan's concern about Nabil's behavior and decision-making. Diana Khabbaz, Rawan's mother and Nabil's ex-wife, described Nabil's mental instability. All of this is evidence more than sufficient to create a dispute of material fact regarding Nabil's susceptibility to undue influence.

But instead, the majority relies on evidence Anton has *never* pointed to—in his briefing here or in the district court.  That includes deposition testimony from Anton that Rawan once agreed during a conversation in October or November 2020 that Nabil's "speech is slurred" before she later "corrected herself."  And it includes Anton's testimony Nabil "went in and out of lucidity."  Yet we are bound by another "fundamental doctrine of appellate review" and "our adversarial system"—"the party-presentation rule"—to consider only the arguments made by the parties in their appellate briefs.  *Jorgensen v. Smith*, 2 N.W.3d 868, 875 (Iowa 2024) (cleaned up).  So this evidence in the summary judgment record discovered by the majority cannot be a basis for reversing the district court's grant of summary judgment.

The majority also accepts Anton's argument that the evidence about Nabil's mental state surrounding the July 2020 beneficiary designations can generate a fact dispute about Nabil's mental state when executing the will in February 2021.  But this reasoning conflicts with the law and the facts.  True, "evidence of the condition of the mind of the testator at other times" besides "the exact time of the making of the will" may sometimes support a challenge to the will.  *In re Est. of Secrist*, 186 N.W.2d 665, 667 (Iowa 1971).  But only "if there is a reasonable basis for the conclusion that it throws some light on his mental competence at the time his will was made."  *Id.*

And here, there is no such reasonable basis in the record.  The undisputed evidence bulleted above shows that Nabil's mental issues resolved by his September 2020 discharge from the hospital.  What's more, those medical records included the conclusion that Nabil's altered medical state at that time was "likely

[due to a] combination of sepsis vs poor self-care and nutritional intake vs subdural hematoma" or "[p]otentially was due to being toxic from pneumonia." They did not suggest it was dementia or other ongoing deterioration of his mental condition where it might be reasonable to infer that his condition in July or September "throws some light" on his condition half a year later. *Secrist*, 186 N.W.2d at 667.

Indeed, even if I were to consider—as the majority does—Anton's testimony about Nabil going "in and out of lucidity," I would not find that it creates a material fact dispute with Shaw's testimony about Nabil's mental state at the exact times he discussed and executed the will. Even Anton admitted that at times Nabil was lucid and that "[i]n moments of lucidity he would know the assets" and "probably could even tell you the numbers and things, but he was not lucid all the time." So leaving aside the ambiguity of what time period Anton was speaking about, there is nothing inconsistent in this testimony with Shaw's observations that Nabil knew what he was doing when they met about the will. If Nabil had times when he was not lucid, Shaw's undisputed testimony shows those meetings were not any of those times.

But again, we need not—and should not—venture down this path addressing arguments Anton did not raise in the district court. There, he failed to point to any evidence from which a jury could find that Nabil lacked capacity or was susceptible to influence at the time he executed the will in February 2021. The court corrected granted Rawan summary judgment and dismissed Anton's challenges to the will.

*The Beneficiary Designations (July 2020).* Anton also asserted both an undue-influence claim and a lack-of-mental-capacity claim in seeking to set aside

the beneficiary designations for his retirement accounts that Nabil made in July 2020. Taking each claim in turn, the undue-influence claim fails—even if Anton has generated a fact dispute about whether Nabil was susceptible to undue influence—because Anton failed to present any evidence from which the jury could conclude the beneficiary designations were "clearly the effect of undue influence." *In re Est. of Davenport*, 346 N.W.2d 530, 532 (Iowa 1984).

To survive summary judgment, a party must show "[m]ore than a scintilla of evidence." *Id.* (cleaned up). And "weak circumstantial evidence which at most raises the possibility of influence is not sufficient." *Id.* Nor is "[m]ere suspicion, surmise, conjecture, or speculation." *Id.* (cleaned up). "The exertion of influence that was undue cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was not only present but that it was in fact exerted with respect to the" execution of the document in question. *Id.* (cleaned up).

Here, it's undisputed that Nabil never talked to Rawan about the beneficiary designation before he made it. Even afterward, he didn't tell her exactly what change he made or why—just that he changed them and "he wants to do what he wants to do, and he'll let me know." And Rawan was not present around that time—she lived in Massachusetts. Anton's other arguably circumstantial evidence—that Rawan failed to let him know about the beneficiary change after promising she would if it ever happened or that she prevented Anton from seeing their father when he came to visit *after* the designation change occurred—have little, if any, relevance to any earlier exercise of influence and do not rise above "the 'scintilla' level" *Davenport*, 346 N.W.2d at 532.

Bottom line, there's no evidence that moves this case out of the realm of speculation on any involvement of Rawan on the beneficiary change. And so, the district court did not err in granting summary judgment on the undue-influence challenge to the beneficiary designation.

The lack-of-capacity claim presents the closest call if I were to reach the merits and consider whether the evidence in the record presents a fact dispute about Nabil's mental capacity in July 2020 when he made the beneficiary change. But once again, I would find our review limited by Anton's advocacy choices. In the district court, Anton devoted one sentence to his lack-of-capacity claims: "Anton relies upon the argument [regarding his undue-influence claim] in support of his position that genuine issues of material fact exist regarding claims of lack of testamentary capacity." He didn't explain what elements of the claim had fact disputes—or even cite a case setting forth the elements. The majority follows Anton's lead in lumping the two claims together and reverses the grant of summary judgment on the lack-of-capacity claim "[f]or the reasons discussed concerning Nabil's mental state in our discussion of the claim of undue influence."

But the two claims are distinct with different elements. *See In re Est. of Cory*, 169 N.W.2d 837, 842–43 (Iowa 1969). True, as the majority cites, our supreme court has said that "[t]he issue of undue influence in a will contest cannot be separated from that of testamentary capacity." *Id.* at 843 (cleaned up). Yet in the same case, the court cautioned "this does not mean the issue of lack of competency to make a will must be submitted to the jury whenever undue influence is submitted. Cases in which the trial court withdrew the issue of competency but submitted undue influence are common." *Id.* So I do not think we can

automatically reverse dismissal of the lack-of-capacity claim without separate analysis. Nor could Anton's one sentence of argument merely cross-referencing his undue-influence arguments in the district court preserve error on his lack-of-capacity claim. And because he failed to preserve error, I would affirm without reaching the merits.

Anton's final claim is tortious interference with his inheritance. On this claim too he makes no independent argument for reversing the dismissal of this claim. Rather, he says only that he "relies on his claim of, and argument for, undue influence as support that Rawan committed a legal wrong that prevented him from receiving an inheritance or gift he otherwise would have received." He said the identical thing in the district court. Because I would hold that the district court correctly dismissed his undue-influence claim, and Anton offers no basis to treat this claim any differently, I would thus also affirm the dismissal of this claim.

II.

Anton's case was not just undermined by the limited arguments he made in his eight-page resistance to summary judgment in the district court. He also failed to "set forth specific facts showing that there is a genuine issue for trial" as required by Iowa Rule of Civil Procedure 1.981(5). This requirement is so important— indeed, it's the core of the summary-judgment question—that the rule requires in addition to the normal legal brief, that the party resisting summary judgment include "a statement of disputed facts, if any." Iowa R. Civ. P. 1.981(3).

While Anton filed a four-page document that he called a "Statement of Disputed Facts," it did not perform that function. *See Toney v. Parker*, 958 N.W.2d 202, 209–10 (Iowa 2021) (holding that miscaptioned statement of disputed facts

should be judged by its substance—not its caption). Rather than responding to Rawan's statement of undisputed facts by *disputing* them with contrary evidence in the record, he merely presented his own alternative statement of facts supported in the record. Like ships passing in the night, his statement did not directly contradict any material fact relied on in the summary judgment motion—at least not in any readily apparent comparison. I'm not sure that this satisfies our summary-judgment rule—and it definitely did not help Anton in making his case.

True, our summary-judgment rule does not contain any detailed direction on how a resisting party must structure his statement of disputed facts. *See* Iowa R. Civ. P. 1.981(3); *Toney*, 958 N.W.2d at 209 n.2. But the supreme court has "encourage[d] litigants in our state courts to follow" the practice required by "the local rules for federal courts in Iowa" that "the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact" and adds "a statement of additional material facts that the resisting party contends precludes summary judgment." *Toney*, 958 N.W.2d at 209 n.2 (cleaned up).

This case shows the wisdom of that encouragement. And as one of the many examples when parties have chosen not to follow that best practice, it highlights that perhaps the time has come to elevate the encouragement to a requirement in the text of our summary-judgment rule. Not only would always having a proper statement of disputed facts "help the district court more easily determine whether any genuine issue of material fact precludes summary judgment." *Id.* It would also help the resisting party focus on what matters at "the put up or shut up moment in a lawsuit," thus making it more likely that a meritorious claim will survive. *Buboltz v. Birusingh*, 962 N.W.2d 747, 754–55 (Iowa 2021)

(cleaned up).  And it would help ensure that the courts considering the motion—initially and on appeal—can stay in their lane deciding only the questions raised by the parties without feeling the pull to comb the record and construct arguments the parties could have made.  *See Murthy v. Missouri*, 144 S. Ct. 1972, 1991 n.7 (2024) ("[J]udges are not like pigs, hunting for truffles buried in the record." (cleaned up)).

The district court did not have that help.  Indeed, it aptly found Anton's approach "to be an exceptionally ineffective method of responding to a well-supported statement of undisputed facts."  Still, the court provided a thoughtful and well-reasoned opinion, doing its best to analyze Anton's claims, the summary-judgment motion, and Anton's limited response.  Given the advocacy before it, the district court did not error.

\*   \*   \*

I am not blind to the harsh result of holding Anton to the arguments that he made to the district court.  At issue is the disposition of about $19 million in assets.  But Anton has had an attorney representing him throughout this proceeding.  And our adversarial legal "system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief."  *State v. Struve*, 956 N.W.2d 90, 99 n.2 (Iowa 2021) (cleaned up)).  The consequences here do not give us leave to disregard our foundational principles of error preservation and party presentment that rest on this premise and constrain us to our proper neutral appellate role.  Abiding by those constraints, I respectfully dissent.